PAINEWEBBER INCORPORATED

v.

Willard S. HARTMANN, Leona R. Hartmann, Appellants.

No. 89–3663.

United States Court of Appeals, Third Circuit.

Submitted Under Third Circuit Rule 12(6) March 16, 1990.

Decided Dec. 31, 1990.

---

508

Michael J. Boyle, Meyer, Unkovic & Scott, Pittsburgh, Pa., for appellants.

Robert B. Sommer, Steven S. Santoro, Kirkpatrick & Lockhart, Pittsburgh, Pa., for appellee.

Before SLOVITER, BECKER and STAPLETON, Circuit Judges.

OPINION OF THE COURT

BECKER, Circuit Judge.

This is an appeal by Willard and Leona Hartmann from an order of the district court for the Western District of Pennsylvania granting the motion of plaintiff PaineWebber Inc., a brokerage house, for a preliminary injunction to prevent the scheduled arbitration of a securities dispute between PaineWebber and the Hartmanns. The Hartmanns contend that the district court erred in making, rather than referring to an arbitrator, the determination whether a clause in an agreement between

the parties, which stated that claims filed more than six years after the events in dispute were not "eligible for submission" to arbitration, barred their arbitration demand. The district court's jurisdiction was predicated on diversity of citizenship, 28 U.S.C. § 1331. Our jurisdiction is based on 9 U.S.C. § 15(a)(2), which allows an appeal from an interlocutory order granting an injunction against arbitration. We will affirm the district court's order.

## I. FACTUAL AND PROCEDURAL HISTORY

The relevant facts are essentially undisputed. From January through December of 1979, the Hartmanns maintained one or more brokerage accounts with Blyth, Eastman, Dillon & Company (Blyth), a predecessor of PaineWebber. Account executive Dennis Cowden managed these accounts. From January of 1980, through early April of 1982, the Hartmanns maintained one or more accounts with PaineWebber, also managed by Cowden. The last transaction involving any of the Hartmanns' accounts at PaineWebber occurred on March 22, 1982. Cowden then went to work for Shearson Lehman Brothers (Shearson), taking the Hartmanns' accounts with him. From April of 1982, through August of 1985, the Hartmanns maintained one or more accounts with Cowden at Shearson.

In opening their accounts at PaineWebber, the Hartmanns entered into a client agreement in which both parties agreed to submit certain disputes to arbitration. The agreement reads, in relevant part:

Any controversy between us arising out of or pertaining to this contract or the breach thereof, shall be [submitted] ... for arbitration, in accordance with the [rules] ... of either the ... Committee of the New York Stock Exchange, American Stock Exchange, National Association of Securities Dealers, or where appropriate, Chicago ... Exchange or Commodities Futures Trading Commission.

At some point, the Hartmanns came to believe that Cowden had fraudulently mishandled their accounts, causing them considerable loss. On April 18, 1988, the Hart-

manns filed a demand for arbitration with the New York Stock Exchange (NYSE) Department of Arbitration against Blyth, PaineWebber, Shearson, and Cowden.

At all relevant times, Rule 603 of the NYSE Department of Arbitration Rules provided:

*Time Limitation Upon Submission*

No dispute, claim or controversy shall be eligible for submission to arbitration under this Code where six (6) years shall have elapsed from the occurrence or event giving rise to the act or dispute, claim or controversy. This section shall not extend applicable statutes of limitations, nor shall it apply to any case which is directed to arbitration by a court of competent jurisdiction.

The parties agree that Rule 603 is incorporated by reference into their agreement. They also agree that the last account transaction involving PaineWebber, which could give rise to arbitration, occurred on March 22, 1982, and that the demand for arbitration was filed more than six years later. However, the parties dispute the legal effect of this provision.

Arguing that Rule 603 bars submission of the Hartmanns' claim to an arbitrator, PaineWebber filed suit on August 25, 1989, seeking a permanent injunction against the arbitration, then scheduled for September 7, 1989. Pending resolution of the suit, PaineWebber moved for a temporary restraining order (TRO) against the arbitration. The district court denied the TRO application but, after a hearing, granted PaineWebber's motion for a preliminary injunction to stay the arbitration. In so doing, the district court specifically found that, under its interpretation of Rule 603, "[t]he clear intention of [Rule 603] is that a dispute which is more than six years old is not eligible for arbitration." Because the Hartmanns' demand for arbitration undisputedly was filed more than six years after the last event involving PaineWebber, the district court determined that the Hart-

manns' claim was not arbitrable. This appeal followed.[1]

The Hartmanns make only one argument of substance on appeal—that the district court erred in interpreting Rule 603 as a substantive bar to arbitration instead of as a procedural limitation subject to the arbitrator's jurisdiction.[2] As a consequence of this misinterpretation, they submit, the district court erroneously granted PaineWebber a preliminary injunction staying the scheduled arbitration.

■ Because the interpretation of contractual language to discern contractual intent is a question of fact, our review is limited to a determination whether the district court's findings are clearly erroneous. *See Harkins Co. v. Waldinger Corp.*, 796 F.2d 657, 660 (3d Cir 1986), *cert. denied*, 479 U.S. 1059, 107 S.Ct. 939, 93 L.Ed.2d 989 (1987). Moreover, because this action involves an arbitration agreement connected to a transaction involving interstate commerce, we must look to the federal Arbitration Act, 9 U.S.C. § 1, *et seq.*, and the case law that has evolved thereunder, in reviewing the propriety of the district court's order. 9 U.S.C. § 2; *see also Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 24, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983) ("The effect of [9 U.S.C. § 2] is to create a body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act."); 13B C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 3569 (2d ed. 1984) ("[E]ven in a diversity suit or an action in state court if a ... transaction ... in interstate or foreign commerce is involved, the substantive rules contained in the [Arbitration] Act, based as it is on the commerce ... power[ ], are to be applied regardless of state law.").[3]

## II. WHO DECIDES ARBITRABILITY?

In general, § 4 of the Arbitration Act enables a litigant to invoke the authority of a federal district court in order to force a reluctant party to arbitrate a dispute. *See* 9 U.S.C. § 4. Specifically, § 4 requires a federal district court to hear an action brought by "[a] party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration." It further directs the district court to order a reluctant party to arbitrate if, after hearing the parties, it is "satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue." Section 4 continues, however, that "[i]f the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to the trial thereof."

■ Unfortunately, the general language of § 4 fails to delineate with precision the scope of the district court's jurisdiction in an action to compel arbitration. In particular, it provides no guidance as to what renders a "refusal to perform" sufficiently *"in issue"* to warrant a trial in the district court. (Emphasis added). Fortunately, however, case law has clarified the

---

1. The Hartmanns proceeded to arbitration on their claims against Shearson and Cowden. These separate arbitration proceedings, which are not at issue here, resulted in awards in favor of the Hartmanns.

2. The Hartmanns' ultimate contention, we presume, is that, if they are permitted to arbitrate their claim, they will be able to persuade the arbitrator that the six-year time period was somehow tolled, thus permitting them to proceed to the merits of the dispute.

3. In the proceedings before the district court, the parties and the court apparently proceeded under the assumption that, because the court's jurisdiction was premised on diversity and the relevant events occurred in Pennsylvania, the Pennsylvania Uniform Arbitration Act, 42 Pa.C.S.A. § 7301 *et seq.*, governed. Fortunately, the federal Arbitration Act and the Pennsylvania Uniform Arbitration Act, and the case law that has developed under each, are functionally equivalent as regards the authority of a district court to review an agreement to arbitrate and to stay or compel arbitration. *Compare* 9 U.S.C. § 4 *with* 42 Pa.C.S.A. § 7304. Consequently, the erroneous application of Pennsylvania law in the district court has no practical bearing on the propriety of the court's order or on our review. Indeed, because the relevant federal and Pennsylvania case law is so clearly established and has evolved essentially in unison, we will refer to them interchangeably where helpful.

limits of the court's jurisdiction considerably. An "issue" requiring resolution by the district court arises under § 4 *only* when the party refusing to arbitrate contends that the dispute is not one that the parties agreed to arbitrate. As a matter of contract, no party can be forced to arbitrate unless that party has entered into an agreement to do so. *See AT & T Technologies v. Communications Workers of America,* 475 U.S. 643, 648, 106 S.Ct. 1415, 1418, 89 L.Ed.2d 648 (1986); *Steelworkers v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 582, 80 S.Ct. 1347, 1352, 4 L.Ed.2d 1409 (1960); *Morristown Daily Record v. Graphic Communications Union, Local 8N,* 832 F.2d 31, 33 (3d Cir.1987). Before compelling an unwilling party to arbitrate, § 4 therefore requires the court to engage in a limited review to ensure that the dispute is arbitrable—i.e., that a valid agreement to arbitrate exists between the parties and that the specific dispute falls within the substantive scope of that agreement. *See AT & T Technologies,* 475 U.S. at 649, 106 S.Ct. at 1418; *John Wiley & Sons, Inc. v. Livingston,* 376 U.S. 543, 546–47, 84 S.Ct. 909, 912–13, 11 L.Ed.2d 898 (1964); *Laborers' International Union v. Foster Wheeler Corp.,* 868 F.2d 573, 576 (3d Cir. 1989).

 If a court determines that a valid arbitration agreement does not exist or that the matter at issue clearly falls outside of the substantive scope of the agreement, it is obliged to enjoin arbitration. If, on the other hand, the court determines that an agreement exists and that the dispute falls within the scope of the agreement, it then must refer the matter to arbitration without considering the merits of the dispute. *See AT & T Technologies,* 475 U.S. at 649–50, 106 S.Ct. at 1418–19; *Beck v. Reliance Steel Products Co.,* 860 F.2d 576, 579 (3d Cir.1988). In making this determination, the court must operate under a "presumption of arbitrability in the sense that '[a]n order to arbitrate the particular grievance should not be denied unless it may be said with *positive assurance* that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.'" *AT & T Technologies,*

475 U.S. at 650, 106 S.Ct. at 1419 (quoting *Warrior & Gulf,* 363 U.S. at 582–83, 80 S.Ct. at 1353) (emphasis added). The parties do not contest that a valid agreement to arbitrate exists between them. The sole issue is whether it may be said with "positive assurance" that the instant dispute falls outside the substantive scope of the agreement.

Like any contract, an agreement to arbitrate may be limited in its substantive scope in an almost infinite variety of ways. Obvious examples include limitations as to the parties and the types of disputes covered by the agreement. It is also not hard to conceive of agreements containing economic limitations (e.g., only disputes involving less than $10,000) or geographic limitations (e.g., only disputes arising in Pennsylvania) on the parties' obligation to arbitrate. Similarly, as numerous courts have recognized, parties to an arbitration agreement might substantively limit their obligation to arbitrate in a *temporal* sense. *See National Railroad Passenger Corp. v. Boston & Maine Corp.,* 850 F.2d 756, 762 (D.C.Cir. 1988) ("[T]he parties have it within their power to specify the date and hour at which their obligation to arbitrate is to end.... Where they have done so, there is nothing fairly arguable to refer to arbitration."); *Hussey Metal Division v. Lectromelt Furnace Division,* 471 F.2d 556, 558–59 (3d Cir.1972) (language in arbitration agreement provided that parties' obligation to arbitrate disputes ended when work on underlying contract was completed); *Westmoreland Hospital Association v. Westmoreland Construction Co.,* 423 Pa. 255, 258–59, 223 A.2d 681, 682 (1966) (same); *Emmaus Municipal Authority v. Eltz,* 416 Pa. 123, 126, 204 A.2d 926, 927 (1964) (same).

 PaineWebber's contention is that, by providing that "[n]o dispute ... shall be eligible for submission to arbitration ... where six (6) years shall have elapsed from the occurrence or event giving rise to the ... dispute," Rule 603 was intended to serve as just such a substantive limitation on the life of its obligation to arbitrate. PaineWebber submits that the law thus

required the district court to do precisely what it did, namely, protect PaineWebber from being forced to arbitrate a dispute that arose after the agreement to arbitrate had expired.

Unfortunately for PaineWebber, a particular clause or phrase rarely generates only a single plausible interpretation. Not surprisingly, the Hartmanns read Rule 603 differently than does PaineWebber. Rule 603, the Hartmanns contend, was not intended as a substantive temporal limitation on the agreement to arbitrate, but rather as a procedural requirement—a statute of limitations of sorts—governing the initiation of disputes that already fell within the substantive limits of the agreement to arbitrate. From this perspective, satisfaction of this mere procedural requirement was not a necessary precondition to arbitration.

In metaphorical terms, the Hartmanns' argument is that, contrary to PaineWebber's characterization of the situation, the parties were already through the gate and within the jurisdiction of the arbitrator. The Hartmanns submit that it was therefore for the arbitrator to decide, in light of the facts, the effect of their failure to comply with the procedural requirements of Rule 603. Instead, the Hartmanns contend, the district court, thinking it was rightfully applying Rule 603 as a substantive bar to keep the parties outside of the gate to arbitration, actually and erroneously used Rule 603 to reach inside and pull them back out.

In general terms, the Hartmanns' interpretation of the legal effect of Rule 603 is quite plausible. Indeed, there is abundant precedent holding that time bar clauses in arbitration agreements are essentially procedural in nature and thus should not be interpreted by courts as substantive bars to arbitration. *See County of Durham v. Richards & Associates, Inc.*, 742 F.2d 811, 815 (4th Cir.1984); *Belke v. Merrill Lynch, Pierce, Fenner & Smith*, 693 F.2d 1023, 1027–28 (11th Cir.1982); *O'Neel v. National Association of Securities Dealers, Inc.*, 667 F.2d 804, 807 (9th Cir.1982); *Conticommodity Services Inc. v. Philipp &*

*Lion*, 613 F.2d 1222, 1227 (2d Cir.1980). In fact, PaineWebber does not dispute that if the Hartmanns' reading of Rule 603 is correct, the district court's stay of arbitration must be overturned.

In short, the dispute before the district court, and now this court, is not so much legal as linguistic and interpretive in nature. The parties offer two plausible interpretations of Rule 603 and two distinct, but coherent, lines of authority leading to two opposite conclusions regarding the propriety of the district court's order. The sole question is which of the two proffered interpretations of the language and original intent of Rule 603 should prevail, keeping in mind that arbitration should be compelled unless it can be said with "positive assurance" that the agreement to arbitrate does not cover the dispute, *see supra* at 8.

This case turns then on a determination of the degree of interpretive certainty necessary to constitute "positive assurance" under *AT & T Technologies*. We confess, at the outset, that the language of Rule 603 is not crystal clear. If "positive assurance" means "absolute certainty"—i.e., that even slight interpretive doubt must be resolved in favor of arbitration—then the district court committed clear error and its order must be overturned, *see supra* at 510. More generally, because virtually all contractual language is susceptible to multiple interpretations and some doubt usually exists, such an extreme reading of the "positive assurance" requirement would force courts to refer almost all disputes over arbitration to the arbitrator, regardless of the parties' contractual intent. We think that such a result ultimately would disserve the very institution it purports to protect. We thus decline to adopt this reading for the reasons trenchantly articulated by the District of Columbia Circuit:

> [W]e must ... recognize the Supreme Court's underlying concern in *AT & T Technologies:* "The willingness of parties to enter into agreements that provide for arbitration of specified disputes would be 'drastically reduced' [if the arbitrator] had the 'power to determine his own jurisdiction....'" Similarly, if we

allow the federal policy favoring arbitration, with its accompanying presumption of arbitrability, to override the will of the parties by giving the arbitration clause greater coverage than the parties intended, then in the longer run we risk undermining rather than serving that policy.... [P]rivate parties may be reluctant to agree to arbitration if they believe that, despite their best efforts to express their wishes to the contrary, any slight ambiguity in their words or deeds can be seized upon to extend their obligation to arbitrate beyond the term of their contract. Therefore, mindful as we are of the federal policy in favor of arbitration, it is our task nonetheless to determine what appears to be most consistent with the intent of the parties.

*National Railroad Passenger Corp. v. Boston & Maine Corp.,* 850 F.2d 756, 760–61 (D.C.Cir.1988) (citations omitted).

This is not to say that the presumption of arbitrability expressed in *AT & T Technologies* should be disregarded. Genuine interpretive disputes should be resolved in favor of arbitrability. We simply hold that a compelling case for nonarbitrability should not be trumped by a flicker of interpretive doubt.

In light of this standard for determining arbitrability, the question remains whether the district court committed clear error in stating with "positive assurance" that Rule 603 rendered the instant dispute nonarbitrable. In deciding this question, three factors impress us.

First, the plain language of Rule 603 states that after six years from the events giving rise to a dispute have elapsed, the dispute "shall [not] be *eligible* for *submission* to arbitration." (Emphasis added). "Eligible" is defined as "fitted or qualified to be chosen or used" or "worthy to be chosen or selected." *Webster's Third New International Dictionary* 736 (1966). "Submission" is defined as the act of "commit[ting something] for consideration, study, or decision." *Id.* at 2277. Interpolating these definitions into the text of Rule 603, the relevant portion of the rule would state that, after six years, a dispute

"shall [not] be worthy to be chosen or selected for [the] consideration, study, or decision [of] arbitration." We think this expanded reading of Rule 603 unambiguously supports PaineWebber's argument and the district court's conclusion that the parties intended to bar from arbitration disputes raised more than six years after the events giving rise to them.

Second, the only other appellate court to interpret, in a similar context, language identical to Rule 603—namely that found in § 15 of the Code of Arbitration Procedure of the National Association of Securities Dealers (NASD)—reached the same conclusion as do we. In *PaineWebber Inc. v. Farnam,* 870 F.2d 1286, 1292 (7th Cir. 1989), the Seventh Circuit also reasoned that the word "eligible" must be given its plain and literal meaning and interpreted it as absolutely barring stale disputes from reaching arbitration. It is interesting to note, additionally, that the *Farnam* court based its decision, in part, on a letter, written in 1988, in which an NASD staff attorney stated that the organization intended § 15 to function as "an eligibility requirement rather than a statute of limitations." *Id.* This letter is not, of course, direct evidence of the NYSE's intent in drafting Rule 603. Because it was written two years before the instant dispute and reflects the views of a related securities organization, however, this letter does confirm that it is not at all disingenuous or unreasonable for PaineWebber to assert now that the NYSE had a similar intent in promulgating Rule 603.

Third, the language of Rule 603 stands in stark contrast to that found in the cases cited by the Hartmanns. *See supra* at 512. In *Belke v. Merrill Lynch, Pierce, Fenner & Smith,* 693 F.2d 1023 (11th Cir. 1982), for example, a party failed to comply with the requirement that "[a]rbitration ... be commenced within one year after the cause of action accrued by service upon the other of a written demand for arbitration." *Id.* at 1026. This language is redolent of a statute of limitations. The court therefore held, quite reasonably we think, that this requirement was procedural in

**514**

nature and that its application should be decided by the arbitrator. *Id.* at 1027–28; *see also Conticommodity Services Inc. v. Philipp & Lion,* 613 F.2d 1222, 1226 (2d Cir.1980) (holding that a provision requiring that "[a] party desiring to initiate an arbitration proceeding, within one year of the date of the transaction or event which gave rise to the claim or grievance, shall file ... a concise statement of claim or controversy" raised a procedural issue within the province of the arbitrator).

For the foregoing reasons, we are satisfied that the district court did not commit clear error in interpreting Rule 603. However, our holding is no more expansive than this. Language less distinct than "eligible for submission to arbitration" might well be insufficient to overcome the strong jurisprudential pull towards arbitration.

## III. PRELIMINARY INJUNCTION

■■■ To secure a preliminary injunction, a moving party must show (1) a reasonable probability of success on the merits and (2) that it will be irreparably injured *pendente lite* if relief is not granted. *See Bradley v. Pittsburgh Board of Education,* 910 F.2d 1172, 1175 (3d Cir.1990). In reviewing a district court's grant of a preliminary injunction, we may reverse only if the court abused its discretion or erred in applying the law. *See Duer Spring & Manufacturing Co. v. Pennsylvania,* 906 F.2d 968, 969 (3d Cir.1990).

■■■ The district court determined that PaineWebber had demonstrated a reasonable probability of success on the merits because, in the district court's view, Rule 603 substantively barred arbitration of the Hartmanns' claim. For the reasons set forth above, we hold that this conclusion was neither an abuse of discretion nor an error of law.

The district court further determined that PaineWebber would suffer irreparable harm if it were forced to arbitrate a dispute outside the substantive scope of the arbitration agreement. The Hartmanns argue on appeal that this determination constituted an error of law. The crux of the Hartmanns' argument is that PaineWebber could have presented to an arbitrator the same arguments it raised before the district court regarding the proper interpretation of Rule 603 and the proper scope of the arbitrator's jurisdiction to decide the underlying dispute. If the arbitrator found compelling PaineWebber's arguments regarding Rule 603, the Hartmanns assert, he or she would have rejected, as did the district court, the Hartmanns' request to arbitrate the underlying dispute. The Hartmanns thus conclude that PaineWebber would not have suffered irreparable harm if the district court had refused to stay the arbitration. With all respect, we believe the Hartmanns' argument misses the mark.

The Hartmanns argue, in essence, that it makes no difference whether the court or an arbitrator decides, as an initial matter, the scope of the arbitrator's jurisdiction under the arbitration agreement because the outcome will be the same in either event. While this argument strikes us as unsound on what might be described as empirical or behavioral terms,[4] we need not rest our decision on the imperfect art of prognostication. In the end, the argument fails because it squarely contradicts the Supreme Court's jurisprudence. As we noted previously, *see supra* at 510–511, the Supreme Court has clearly and repeatedly stated that "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT & T Technologies,* 475 U.S. at 648, 106 S.Ct. at 1418 (quoting *Warrior & Gulf,* 363 U.S. at 582, 80 S.Ct. at 1352). The logical corollary of this policy is that a party cannot be required to arbitrate the threshold "dispute," as it were, of whether the underlying dispute is itself arbitrable. Hence, "the question of arbitrability ... is undeniably an issue for judicial determination." *AT & T Technologies,* 475 U.S. at 649, 106 S.Ct. at 1418.

**4.** As a general matter, it is difficult to predict how often arbitrators will construe the scope of their jurisdiction in the same manner as would a court. One certainly cannot predict with confidence what a specific arbitrator would do, *vis a vis* the court, when called upon to interpet specific contractual language and to make a specific determination of arbitrability.

In light of this policy, we think it obvious that the harm to a party would be *per se* irreparable if a court were to abdicate its responsibility to determine the scope of an arbitrator's jurisdiction and, instead, were to compel the party, who has not agreed to do so, to submit to an arbitrator's own determination of his authority. Even if such things could be known in advance, it would be irrelevant whether the arbitrator's determination would be the same as the court's. A reluctant party has a right to a judicial determination of his obligation to arbitrate. We hold, therefore, that the district court did not abuse its discretion or commit an error of law in determining that PaineWebber would suffer irreparable harm if it were forced to submit to the arbitrator's jurisdiction, if even just for a determination of the scope of that jurisdiction.[5]

## IV. CONCLUSION

The order of the district court granting PaineWebber's motion for a preliminary injunction to stay arbitration will be affirmed, and the case will be remanded to the district court for consideration of PaineWebber's motions for a declaratory judgment and for a permanent injunction staying the arbitration.

SLOVITER, *Circuit Judge,* dissenting.

I respectfully dissent. The majority opinion has fully set forth the issue and the relevant case law, and therefore no extended discussion is necessary.

I am concerned that the majority's approach will unnecessarily derogate from the strong policy to leave disputed issues to the arbitrator. I agree that the court must decide the scope of the parties' agreement to arbitrate. However, the issue in this case is not whether the dispute falls within the scope of the arbitration clause. The parties agree that it does. Instead, the majority elevates a time limitation provision, which is at most a defense to the claim, to the same level as a limitation imposed upon the subject matter of the agreement to arbitrate. This I believe is error.

I would agree with those courts that have held that the question whether a demand to arbitrate was time barred is within the exclusive province of the arbitrator. *See, e.g., ContiCommodity Services, Inc. v. Philipp & Lion,* 613 F.2d 1222, 1226 (2d Cir.1980); *accord County of Durham v. Richards & Associates, Inc.,* 742 F.2d 811, 815 (4th Cir.1984); *O'Neel v. National Ass'n of Securities Dealers,* 667 F.2d 804, 807 (9th Cir.1982); *see also Muhlenberg Township School Dist. Auth. v. Pennsylvania Fortunato Constr. Co.,* 460 Pa. 260, 265, 333 A.2d 184, 187 (Pa.1975) (question whether demand for arbitration was timely is for arbitrator and is outside the bounds of the court's review). We cannot assume that the arbitrator will not fairly decide the issue of the timeliness of the demand.

I would therefore reverse the district court's entry of the preliminary injunction.

5. The Hartmanns also contend that because PaineWebber filed its suit to stay the arbitration more than 16 months after the Hartmanns' arbitration demand and only 13 days prior to the scheduled arbitration, the district court should have dismissed this suit on grounds of laches. The totality of the Hartmanns' laches defense in the district court, however, is contained in their answer to the complaint which states: "Third Defense: Relief sought by the Plaintiffs is barred by the doctrine of laches." The Hartmanns failed to expand upon this defense at the hearing before the district court and their appellate brief fleshes out this defense only slightly.

The sum and substance of the Hartmanns' laches argument on appeal is the general assertion that:

[I]t is obvious that the sixteen month delay by PaineWebber in filing its Complaint was inexcusable and prejudicial to the Hartmanns.

By waiting until the eve of the arbitration the Hartmanns were necessarily required to devote substantial time in preparation for arbitration against PaineWebber which would not have been required in the event of a timely complaint by PaineWebber.

If, indeed, the delay was undue and the Hartmanns were materially prejudiced, a viable defense of laches may exist. *See Waddell v. Small Tube Products, Inc.,* 799 F.2d 69 (3d Cir.1986). However, absent any factual record from which we might draw such inferences, the Hartmanns' allegations remain conclusory and inadequate to sustain a laches defense.