**CAPITOL PLACE I ASSOCIATES L.P. and 555 New Jersey Avenue, Inc., Appellants,**

v.

**GEORGE HYMAN CONSTRUCTION COMPANY, Appellee.**

**Nos. 95–CV–75 & 95–CV–282.**

District of Columbia Court of Appeals.

Argued Nov. 17, 1995.
Decided March 21, 1996.

Warwick R. Furr II, Tampa, FL, with whom Thomas M. Brownell, Vienna, VA, was on the brief, for appellants.

Charles H. Samel, Washington, DC, with whom Bruce J. Moldow, Bethesda, MD, and Timothy N. England, Los Angeles, CA, were on the brief, for appellee.

Before WAGNER, Chief Judge, and SCHWELB, Associate Judge, and MACK, Senior Judge.

MACK, Senior Judge:

Appellant[1] filed a demand for arbitration of claims related to appellee's construction of a large office building. Appellee sought a preliminary injunction in the trial court on

---

1. There were technically two different defendants below, Capitol Place I Associates L.P. and 555 New Jersey Avenue, Inc., and there are two different appellants here. However, their interests are the same, and they have briefed the matter together. Further, Capitol Place I is solely owned by 555 New Jersey. Also, the general partner of Capitol Place I has changed, with the American Federation of Teachers (through its ownership of 555 New Jersey) substituting for the developer. Since most of this is irrelevant to the issues on appeal, and reference to it in the text would cloud matters, the singular "appellant" is used throughout.

the ground that the demand for arbitration was barred by the statute of limitations. Appellant asserted that the resolution of the statute of limitations question was for the arbitrator alone and, alternatively, that the statute of limitations had not run at the time it filed its demand for arbitration because the period of limitations was tolled pursuant to the "discovery exception." *See Ehrenhaft v. Malcolm Price,* 483 A.2d 1192 (D.C.1984). The trial court rejected both of appellant's arguments and granted the injunction.[2] This appeal followed. We affirm.

### I.

Appellant, a partnership that included the American Federation of Teachers (AFT), as well as Gary S. Frank and Sheldon B. Kamins, principals in a commercial property development and management firm known as BFK, contracted with appellee, George Hyman Construction Company, a large commercial builder, for the construction of a 12–story office building to be known as Capitol Place I, at 555 New Jersey Avenue, N.W. Under the contract, dated December 13, 1982, the parties generally agreed to arbitrate claims arising from the contract, but also provided that, "in no event," shall a demand for arbitration "be made after the date when institution of legal or equitable proceedings based on such claim, dispute, or other matter in question would be barred by the applicable statute of limitations." The building was substantially completed by 1984, and one of appellant's constituent partners (and its primary one today), the AFT, began occupancy. While returning to the building for repairs and the completion of other work over the following few years, appellee last worked on the building no later than February 28, 1991.

Prior to entering the construction contract with appellee, appellant contracted with an architectural firm both to design the building and to monitor its construction. The individual architect assigned to the project eventually became directly employed by BFK and continued to oversee the project. When that occurred, the architectural firm assigned another individual to monitor the project.

From the outset, the building was plagued with problems, most of them related to water infiltration. At and after the time of construction, the architectural firm's representative and the architect working directly for BFK saw efflorescence on the building's facade, which is indicative of water infiltration. In 1986, BFK's architect began complaining to appellee that water was leaking into the building. In 1989, the AFT repeatedly complained to BFK concerning leakage into the building, noting symptoms including "squishy" carpets and mushroom growth in two or three offices. In 1990, the AFT continued to note the water infiltration problem in its correspondence to BFK. The building's on-site engineer recalled seeing efflorescence in 1990.

Appellant, through its architect, learned of masonry distress problems in the building beginning in 1987. Appellee returned to the building and added more expansion joints to the building that year. Appellant complained the next year about the cracking of the facade and improper flashing and, after a meeting with appellee, took steps to remedy the problem including the hiring of an independent expert to examine some of the walls. In 1990, appellee again returned to the building in an attempt to address the leakage problem. Appellant hired an additional expert to inspect the facade in 1990, and this company performed a substantial number of repairs.

In connection with refinancing, an engineer inspected the building in October 1992, and shortly thereafter issued a report outlining deficiencies in design and construction. In 1993, appellant began questioning BFK, which no longer had an interest in the building, concerning its knowledge of the problems. Notably, BFK defended against the implication of these questions by noting, among other things, that everyone knew about these problems for more than a decade and that a conscious decision to avoid litigation, and its attendant costs, had been made

---

**2.** In addition to the two issues noted, appellant argues that costs were inappropriately assessed.

We affirm on that issue as well.

by the owners of the building. In February 1994, appellant sent a copy of the report to appellee, requesting assistance. On March 15, 1994, appellee denied responsibility, informing appellant that it would not cure the problems.

On April 29, 1994, appellants made a demand for arbitration. On May 31, 1994, appellee sought injunctive relief to prevent arbitration on the ground that the statute of limitations had long passed, leaving the demand for arbitration untimely. On July 22, 1994, the trial court denied a motion to dismiss by appellant, which had argued that the statute of limitations question was for the arbitrator. On January 3, 1995, after discovery limited to the statute of limitations question, the trial court granted appellee's motion for summary judgment on that issue and enjoined appellant from proceeding with arbitration.

## II.

Preliminarily, we consider whether the trial court had the power to decide the statute of limitations question at all, or whether it should have permitted the arbitrator to decide that issue.

As the United States Supreme Court has noted, "[T]he question of arbitrability— whether [an agreement] creates a duty for the parties to arbitrate [a] particular grievance—is undeniably an issue for judicial determination." *AT & T Technologies, Inc. v. Communications Workers of America*, 475 U.S. 643, 649, 106 S.Ct. 1415, 1418, 89 L.Ed.2d 648 (1986). There is a strong presumption in favor of courts deciding whether an arbitrator has the "power to determine [ ] jurisdiction." *Id.* at 651, 106 S.Ct. at 1419. Thus, "[u]nless the parties clearly and unmistakably provide otherwise, the question of whether the parties agreed to arbitrate is to be decided by the court, not the arbitrator." *Id.* at 649, 106 S.Ct. at 1418; *see Virginia Carolina Tools v. International Tool*, 984 F.2d 113, 117 (4th Cir.) (presumption of arbitrability does not apply to "questions of the arbitrability of arbitrability issues them-

selves"), *cert. denied*, 508 U.S. 960, 113 S.Ct. 2930, 124 L.Ed.2d 681 (1993).

In *National Railroad Passenger Corp. v. Boston & Maine Corp.*, 271 U.S.App.D.C. 63, 850 F.2d 756 (1988), the D.C. Circuit considered a dispute over whether all of a contract's terms—including an agreement to arbitrate disputes—had been extended by subsequent amendments. The court noted:

[T]he parties have it within their power to specify the date and hour at which their obligation to arbitrate is to end, or to specify a clear condition subsequent, such as sending of notice, giving any party the right to terminate that obligation. Where they have done so, there is nothing fairly arguable to refer to arbitration.

*Id.* at 69, 850 F.2d at 762.[3]

A question very similar to that here was presented in *PaineWebber Inc. v. Hartmann*, 921 F.2d 507 (3d Cir.1990). There, the parties had signed a contract containing an arbitration clause which incorporated a rule that provided that no claim "shall be eligible for submission to arbitration under this Code where six (6) years have elapsed from the occurrence or event giving rise to the [claim]." *Id.* at 509. The Third Circuit noted that "parties to an arbitration agreement might substantively limit their obligation to arbitrate in a *temporal* sense." *Id.* at 511 (emphasis in original). Recognizing that the provision at issue was "not crystal clear," the court nonetheless noted that by using the word "eligible" the parties intended to bar from arbitration matters raised more than six years after the events giving rise to them. *Id.* at 512–13. Therefore, it ruled that the lower court had properly removed the arbitrability issue from the purview of the arbitrator and decided the issue itself. *Id.* at 514.

Asked to construe a contract provision that is just like the one the Third Circuit considered in *PaineWebber*, we conclude that the instant provision is too unclear to overcome the presumption in favor of having a court determine the arbitrability question. As

---

**3.** In the instant case, the trial court noted that it was well aware of appellant's disagreement with its interpretation of *National Railroad, supra*, but

declined to revisit that interpretation in the decision and order granting appellee's summary judgment motion.

there, we recognize that in this case the provision at issue was somewhat ambiguous, because the question of when the statute of limitations ran was not resolved with clarity. Nonetheless, the parties unmistakenly intended for the duty to arbitrate to end once the limitations period had expired. The parties did this by imposing a time limit on the "demand" for arbitration (see the clause in *PaineWebber* referring to whether a claim is "eligible" for arbitration). Indeed, if the parties, as appellant now wants us to conclude, intended only that the statute of limitations was to be considered by the arbitrator in rendering its decision, they should have stated that unambiguously in their contract. In short, specificity will overcome the presumption against the arbitrability of arbitrability questions, but such is lacking here.

While mindful of the important role that arbitration can play in resolving disputes, we are wary of dissuading parties from entering arbitration agreements by expanding the breadth of arbitrability beyond that provided in an agreement. As the D.C. Circuit noted in *National Railroad:*

> [I]f we allow the federal policy favoring arbitration, with its accompanying presumption of arbitrability, to override the will of the parties by giving the arbitration clause greater coverage than the parties intended, then in the longer run we risk undermining rather than serving that policy. In cases such as this one, for example, private parties may be reluctant to agree to arbitration if they believe that, despite their best efforts to express their wishes to the contrary, any slight ambiguity in their words or deeds can be seized upon to extend their obligation to arbitrate.

271 U.S.App.D.C. at 67, 850 F.2d at 760; *see First Options of Chicago, Inc. v. Kaplan,* ——— U.S. ———, ———, 115 S.Ct. 1920, 1925, 131 L.Ed.2d 985 (1995).

 Accordingly, like other courts that have faced substantially similar questions, *see 200 Levee Drive Assoc. v. Bor–Son,* 441 N.W.2d 560, 563, 564 (Minn.Ct.App.1989); *Frederick Contractors v. Bel Pre Medical Ctr.,* 274 Md. 307, 334 A.2d 526, 530 (1975),

we hold that whether the statute of limitations has run is for the court to decide in the absence of an unambiguous contractual provision to the contrary. Thus, the Superior Court properly rejected appellant's arguments in favor of compelling arbitration.

## III.

 Turning to the statute of limitations question, we consider whether appellant can avail itself of the tolling "discovery exception." This question comes to us following a granting of summary judgment pursuant to Supr.Ct.Civ.R. 56(c). In such a situation, "The standard of review on appeal is identical to the trial court's standard; we will affirm the entry of summary judgment if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Byrd v. Allstate Ins. Co.,* 622 A.2d 691, 693 (D.C.1993) (citation omitted). The record must be construed "in the light most favorable to the party opposing the motion." *Graff v. Malawer,* 592 A.2d 1038, 1040 (D.C.1991) (citation omitted); *see also Fry v. Diamond Constr., Inc.,* 659 A.2d 241, 246 (D.C.1995); *Vessels v. District of Columbia,* 531 A.2d 1016, 1019 (D.C.1987). With these standards in mind, we seek to determine here whether, as a matter of law, appellant's claims, sounding in both contract and tort, accrued prior to the expiration of the statutory period.

## A.

 Generally, for statute of limitations purposes, a cause of action must be brought within a certain period "from the time the right to maintain the action accrues." D.C. Code § 12–301 (1995 Repl.). For actions sounding in contract or tort, the period of limitations is three years. D.C.Code § 12–301(3) & (7) (1995 Repl.). Generally, accrual for contract cases occurs when the contract is first breached. *Western Union Tel. Co. v. Massman Const. Co.,* 402 A.2d 1275, 1277 (D.C.1979). In negligence actions, accrual usually occurs upon the date that injury results from the negligence. *Shehyn v. Dis-*

*trict of Columbia*, 392 A.2d 1008, 1013 (D.C. 1978).

■ To avoid the injustice that periods of limitation may work upon those parties that did not know, and could not have reasonably known, that a cause of action existed, this and other courts have recognized a period of limitations tolling device known as the "discovery exception." *See Burns v. Bell*, 409 A.2d 614, 615–17 (D.C.1979) (describing exception's evolution and its ameliorative intent). The discovery exception provides that "a particular cause of action accrues 'when the plaintiff knows or through the exercise of due diligence should have known of the injury.'" *Ehrenhaft*, *supra*, 483 A.2d at 1201 (citation omitted). Stated a slightly more specific way, accrual occurs pursuant to the discovery exception when a party knows or by the exercise of reasonable diligence should know: (1) of the injury; (2) the injury's cause in fact; and (3) of some evidence of wrongdoing. *Bussineau v. President & Directors of Georgetown College*, 518 A.2d 423, 435 (D.C.1986), *reh. denied*, 525 A.2d 595 (D.C.1987).

■ The discovery exception came into existence in the context of medical malpractice, with the quintessential case being one in which a foreign object, having been left behind during surgery, is discovered after the statutory period. *Ehrenhaft*, *supra*, 483 A.2d at 1201 (*citing Burke v. Washington Hospital Ctr.*, 293 F.Supp. 1328, 1333–34 (D.D.C.1968)). We apply a similar rule to legal malpractice matters. *Knight v. Furlow*, 553 A.2d 1232, 1234 (D.C.1989); *Ehrenhaft*, *supra*, 483 A.2d at 1201 & n. 15; *see Weisberg v. Williams, Connolly & Califano*, 390 A.2d 992 (D.C.1978). Central to our application of the exception is either a finding of justifiable reliance upon the transgressor or other circumstances indicating that the party seeking shelter under the statute of limitations has played a significant role in the harm not coming to light. *See Farris v. Compton*, 652 A.2d 49, 53–59 (D.C.1994).

In *Ehrenhaft*, *supra*, we permitted a residential homeowner to invoke the discovery exception against a builder and an architect with whom he had contracted to construct a patio room addition to his home. 483 A.2d at 1194. The room was completed in 1977, but problems with it started within a few months, and the builder and architect made repairs as late as 1979. Many of the symptoms of the deficient construction did not appear until early 1982, and the source of all the problems was not revealed until that summer. In September 1982, the owner filed suit, alleging breach of contract and negligence. The builder and architect moved to dismiss because of the expiration of the limitations period of three years from accrual (from, among other things, the breach of the contract). *Id.* at 1195–96; *see* D.C.Code § 12–301(7). On appeal, this court deemed the discovery toll applicable, such that the statute of limitations did not necessarily bar the claim. *Id.* at 1201–04.

*Ehrenhaft* was based primarily on the policy judgments that gave rise to the discovery rule in the first place, and how the court applied those judgments is informative of whether the court should extend the rule to cover this case. Chief among those was the reliance that a lay individual like Mr. Ehrenhaft necessarily placed on the construction professionals. Thus, the court focused upon whether it was reasonable for Mr. Ehrenhaft to "engage yet another professional to oversee the work as it is performed." *Id.* at 1202. We also found that the relative equities favored Mr. Ehrenhaft because he was not one who "'sat' on his rights." *Id.* at 1202–03. Further, the latency of the construction design there, whereby the "ill effects [were] manifested only years" after the defective construction, also supported application of the discovery exception. *Id.* at 1202.

In *Ehrenhaft*, the court recognized that some jurisdictions had decided to apply the discovery exception in all kinds of cases. *Id.* at 1204 (*citing Poffenberger v. Risser*, 290 Md. 631, 431 A.2d 677 (1981)). We expressly declined to adopt such a broad rule, instead deciding "only the instant case, leaving to the future the application of the rule by analogy to the facts." *Id.*

### B.

■ Assuming without deciding that the discovery rule is applicable in the context of commercial construction disputes,[4] we find it inapplicable here. The indisputable evidence of record shows that the early signs of defect were abundant, making it more than reasonable for appellant, a sophisticated owner, to discover what was wrong with the building. Appellant was a major national organization, which, in partnership with a commercial developer, hired appellee to construct a substantial office building. Indeed, appellant was partners with a developer, which had extensive knowledge of commercial construction and had an architect on its staff to oversee this project. Further, appellant hired its own outside expert on at least two occasions after appellee apparently refused to accept responsibility for the leakage.

While we applaud efforts to avoid litigation through informal attempts at resolving disputes, there is a point where a party must decide to either bring a recalcitrant party before the court or forgo that option. Needless to say, that point was reached here some time before the demand for arbitration was filed. This is particularly so given that there is no question but that appellant had the financial wherewithal, stake, and ability to bring litigation. Further, the relative latency of the instant defects was not as substantial as that in *Ehrenhaft*, since in this case the problems began manifesting themselves almost immediately and thus made it more than reasonable for appellant to find out promptly just what was their cause without relying on appellee. No impartial jury could reasonably find to the contrary.

Indisputably, too, appellant had actual knowledge of injury to its building more than three years before it filed the demand. As the trial court observed:

> The record literally cries out with knowledge on the part of the [owners] that a cause of action against the [builder] was viable.... The problems were there to be seen; tenants complained of the water infiltration, efflorescence was seen as early as 1984 (which indicates water infiltration); the cracks to the facade could be and were seen; the shifting facade at the penthouse was seen and discussed with the [builder]; the flashings and soffit concerns were discussed with the [builder]. Clearly, the requisite information necessary to file suit or a timely demand was not concealed.

Viewing the evidence in the light most favorable to appellant, any reasonable person would be compelled to conclude that there was nothing "obscure" about the harm or source thereof, and thus the discovery exception is inapplicable. *See Knight, supra,* 553 A.2d at 1234.

Finally, while appellant must admit that it knew of some of the problems, it asserts that the discovery exception saves its claims because it did not understand the full range of problems until the engineer's report was received (at most two years before the demand for arbitration was made). However, as we have held repeatedly, and in much more compelling cases than this one, "The discovery rule does not [ ] permit a plaintiff who has information regarding a defendant's negligence, and who knows that she has been significantly injured, to defer institution of suit and wait and see whether additional injuries come to light." *Colbert v. Georgetown University,* 641 A.2d 469, 473 (D.C. 1994) (en banc).

---

4. Other jurisdictions have split on the applicability of the discovery rule to claims arising out of commercial development contracts. Among those apparently declining to follow a discovery rule in that context are Massachusetts, Connecticut, New Hampshire, Wisconsin, Vermont, Georgia, Mississippi, Nebraska, and New York. *Melrose Housing Auth. v. N.H. Ins. Co.,* 402 Mass. 27, 520 N.E.2d 493, 497 n. 5 (1988) (discussing individual cases from the jurisdictions listed). Those allowing its use, at least sometimes, in the context of commercial construction include Colorado, Florida, Illinois, Minnesota, North Carolina, and New Jersey. *Id.* (same). Maryland would apparently permit its use. *See Poffenberger v. Risser, supra,* 431 A.2d 677 (discovery rule applicable in all kinds of cases). One New Jersey case is instructive because it apparently deemed the discovery rule applicable to a commercial construction situation, but then found that its applicability was not established in the case before it. *Torcon, Inc. v. Alexian Brothers Hospital,* 205 N.J.Super. 428, 501 A.2d 182 (1985), *aff'd,* 209 N.J.Super. 239, 507 A.2d 289 (App.Div.1986).

## IV.

For the reasons stated, the judgment is

*Affirmed.*