OPTOPICS LABORATORIES CORP. and
Nutramax Products, Inc., Plaintiffs,

v.

Frank C. NICHOLAS, Jeffrey H. Nicholas, Scott H. Nicholas, Peter K. Nicholas, and Lilex Partners, Defendants.

Civil Action No. 96–2771 (JEI).

United States District Court,
D. New Jersey.

Dec. 4, 1996.

Dechert Price & Rhoads, by Robert Rhoad, Mary A. McLaughlin, Maya M. Boguslavsky, Princeton Pike Corporate Center, Princeton, NJ, for Plaintiffs.

George G. O'Brien, Cherry Hill, NJ, for Defendants.

## OPINION

IRENAS, District Judge:

After purchasing defendants' controlling shares in Optopics Laboratories Corporation ("Optopics"), plaintiffs instituted this action alleging fraudulent misrepresentations in connection with the transaction. Defendants deny these claims and seek to submit them to arbitration pursuant to a clause in their merger agreement. Plaintiffs assert their claims fall outside of the contractual provision and oppose defendants' motion to compel arbitration. The matter is further complicated by this Court's lack of authority to compel arbitration outside of its district in the contractually chosen forum of Philadelphia. Because the Court finds counts one and two of plaintiffs' complaint arbitrable but cannot compel arbitration in Philadelphia, it will decide the arbitrability issue, stay counts one and two pending the completion of arbitration, and transfer the case to the Eastern District of Pennsylvania. Because the Court finds that the Philadelphia arbitration will likely resolve plaintiffs' third count, it will stay that count as well.

## I. BACKGROUND

On June 7, 1993, Nutramax Acquisition Corporation ("Nutramax Acquisition") acquired Optopics pursuant to a 103–page merger agreement dated March 2, 1993 ("Merger Agreement"). In exchange for their controlling shares of Optopics, defendants received shares of stock in Nutramax Acquisition's parent company, Nutramax Products, Inc. ("Nutramax Products").[1] Twenty-five percent of defendants' proceeds from the sale were placed in escrow to be dispersed to them in scheduled installments

---

1. The Court will refer to Nutramax Acquisition and Nutramax Products collectively as Nutramax.

following the closing. *See* Merger Agreement at § 4(d).

As would be typical in this type of transaction, the Merger Agreement contemplated a period of time between signing and closing, not only to permit the parties to take the steps necessary to effectuate the transaction, but also to permit Nutramax time to investigate Optopics's affairs "in order to verify the accuracy and the compliance of Optopics with the provisions of this Agreement." *Id.* § 11. If it was "dissatisfied" with the results, Nutramax had the absolute right to terminate the Merger Agreement. *Id.* However, Nutramax's right of investigation did not limit the effect of any representation, warranty, or obligation defendants made in the Merger Agreement. *See id.*

As sellers of a going business, defendants made thirty-five pages of representations and warranties concerning almost every conceivable aspect of Optopics's business. *See id.* § 6. These representations and warranties are contained in thirty-six subsections, many of which contain numerous subparts. Financial statements, business operations, employee benefits, water supply, environmental compliance, tax returns, corporate authority, intellectual property, employment practices, pending or threatened litigation, insurance coverage, and government permits are just a few of the subjects covered. These representations and warranties did not merge into the conveyance documents at closing but rather survived for the shorter of three years or the applicable statute of limitations (except for six specific warranties which survived closing without limitation). *See id.* § 21. Furthermore, because defendants would continue to operate the business between the Merger Agreement's signing and the closing, the Merger Agreement also contained eight pages of covenants by defendants designed to insure that the business Nutramax purchased in March would be the same business conveyed in June.

In Section 13(a) of the Merger Agreement, defendants agreed to indemnify and hold Nutramax harmless "from, against, for and in respect of any and all damages (other than consequential damages, including but not limited to lost profits), losses, obligations, liabilities, claims, lawsuits [uninsured] ... suffered, sustained incurred or required to be paid" by Nutramax after the closing "by reason of or in connection with, or arising out of" six different events. The first three include any misrepresentation or breach of warranty made "in or pursuant to" the Merger Agreement, any breach of any covenants to be performed by defendants prior to closing, and a broad provision covering claims, debts, liabilities, or obligations not properly disclosed in the Merger Agreement. *Id.* § 13(a)(i)–(iii). Like the representations and warranties themselves, the indemnification obligation survives the closing. *See* Merger Agreement at § 13(h).

The Merger Agreement establishes the mechanics of resolving indemnity disputes and providing for payment of valid claims. *See id.* § 13(e)–(f). Subsection (f) provides that the indemnitor "shall pay" the amount of such claims in cash or by certified check. If such payment is not made as required, Nutramax can set off the amount of the claim against defendants' stock in escrow, and the escrow agent may sell the shares to raise the necessary cash. If the proceeds from the escrow prove insufficient to satisfy the claim, "Nutramax shall have the right to pursue any and all other remedies available to it." *Id.* § 13(e). If defendants choose to contest such a set-off, they must serve a "Contest Notice" within fifteen days, and an arbitration to be held in Philadelphia will settle the "contested set-off." *Id.* Section 13 also sets forth procedures to govern the selection of arbitrators and makes their determination "final, binding and conclusive." *Id.* § 13(e)(iii). The "any and all other remedies" language quoted above is the lynchpin on which plaintiffs hang their non-arbitrability argument.

By letter dated June 27, 1994, Nutramax's corporate counsel and drafter of the Merger Agreement, Eugene M. Schloss, Jr., Esq. ("Schloss"), formally informed defendants that plaintiffs were asserting an indemnification claim pursuant to § 13 of the Merger Agreement and that they intended to set off against defendants' remaining escrowed shares. *See* Defendants' Ex. 2. Specifically,

Schloss alleged that defendants misrepresented the following:

1. Optopics's ability to sell sixteen-ounce bottles of saline solution;
2. Optopics's ability to sell Naphoptic–A (a generic prescription product);
3. The availability of 38mm caps for sixteen- and thirty-two-ounce bottles of eye wash;
4. Alleged patent infringement pertaining to hypotonic lubricating eye drops;
5. The existence of workers' compensation claims; and
6. A pre-acquisition loss of customers.

*See id.* On defendants' behalf, defendant Jeffrey H. Nicholas, Esq. ("Nicholas") formally contested plaintiffs' indemnification claim by letter dated July 8, 1994, in which he set forth in detail his response to each claim and requested discovery-type materials. *See* Defendants' Ex. 3. Nicholas made it crystal clear that he considered the asserted claims to be arbitrable:

> Please advise as to whether you agree that your June 27, 1994 letter constitutes a notice under Section 13(d) of the Agreement. As I read it, the intent of Section 13(d) is to not conduct the arbitration until after the indemnification claim has been allowed to take shape, and on this understanding I am not at this time asserting a "contest notice" under Section 13(c). If, however, you disagree with my reading of

the intent of Section 13(d), then please consider this letter to be a "contest notice."

*Id.*

Defendants' view of the arbitrability of the dispute was clearly shared by Schloss. On August 4, 1994, a letter from Schloss conceded that Nicholas' earlier letter could be considered a contest notice under § 13(e) of the Merger Agreement. *See* Defendants' Ex. 4. Just two weeks later, Schloss again wrote Nicholas suggesting an amicable settlement "without the need to progress immediately into arbitration." *See* Defendants' Ex. 6. More than a year later, correspondence from Nicholas to Schloss still reflected his belief-uncontroverted by defendants—that the disputes were arbitrable. *See* Plaintiff's Exs. 4 and 5.[2]

Despite expressing an interest in resolving the dispute amicably, plaintiffs delayed for more than two years in responding to defendants' July 8, 1994 request for documents to evaluate plaintiffs' allegations,[3] resisted arbitration,[4] and ultimately filed suit in the District of New Jersey seeking a judicial, not arbitral, resolution of their indemnification claims. Indeed, plaintiffs only furnished the documents pursuant to a court order entered after the litigation had commenced.[5]

Plaintiffs clearly structured the complaint to facilitate their argument against arbitration. After dealing with jurisdiction, venue, and parties, the complaint has a section cap-

---

**2.** In his letter of October 12, 1995, Nicholas conceded that the dispute over the stock adjustment to be made as a result of the settlement of the GMP litigation was not arbitrable and would be resolved in a "judicial context."

**3.** Defendants first requested these materials by letter dated July 8, 1994, and plaintiffs repeatedly promised to provide them promptly. *See* Defendants' Ex. 4 (promising on August 4, 1994 to provide the requested materials "within the next week to ten days"); Defendants' Ex. 7 (agreeing in a August 1, 1995 meeting to provide the materials, without specifying when); Defendants' Ex. 8 (promising on September 11, 1995 to provide the "documentation in detail as soon as possible"); Plaintiffs' Ex. 6 (promising on October 30, 1995 to send the documents "by the end of November"—presumably November, 1995).

**4.** Plaintiffs' resistance efforts include their opposition to defendants' instant motion and run con-

trary to the pledge their counsel made in 1991 to encourage clients "to pursue alternative dispute resolution procedures ... to reduce the costs and burdens of litigation." Center for Public Resources Institute for Dispute Resolution, *Law Firm Policy Statement on Alternatives to Litigation* (signed by Dechert Price & Rhoads).

**5.** It is unclear why plaintiffs filed suit in the District of New Jersey instead of in the Eastern District of Pennsylvania—where district courts have the authority to compel arbitration in the contractually chosen forum of Philadelphia. Whether by intent or otherwise, from the inception of the dispute, plaintiffs have acted in ways which delay and complicate rather than expedite the resolution of this dispute. *See, e.g., supra* note 3. Maybe the apparent predilection for delay can be explained by the old saw, "Possession is nine points of the law." *Bedall v. Maitland,* 17 Ch. D. 174, 188 (1881) (interpreting a 1382 statute).

tioned "Factual Background" which, in sixty-eight paragraphs (numbers fourteen through eighty-one), repeats five of the six claims set forth in the original demand letter of June 27, 1994,[6] and includes the background of the dispute concerning the GMP litigation.[7] "Count [One]—Indemnification" does not start until page twenty-four of the complaint and merely incorporates paragraphs one through eighty-one of the complaint. Count two for breach of contract incorporates paragraphs one through eighty-seven, while the third count for fraud simply incorporates paragraphs one through ninety-two of the complaint. While counts one and two contain no real factual allegations, except by reference to the earlier Factual Background, count three repeats the same five factual claims but changes the language slightly to fit the rubric of fraud. In count four plaintiffs seek a declaratory judgment establishing the correct number of shares owed defendants as a result of the GMP litigation settlement. Defendants counterclaim for breach of contract and unjust enrichment with respect to the settlement proceeds plaintiffs have retained. Defendants now move this Court to compel arbitration on the first three counts and stay them pending the completion of arbitration.

## II. ARBITRABILITY

The Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 1–16, applies to arbitration provisions in any contract that is in any way connected to interstate commerce. *See* 9 U.S.C. § 2; *see also Crawford v. West Jersey Health Sys.*, 847 F.Supp. 1232, 1240 (D.N.J. 1994) (requiring only the "slightest nexus with interstate commerce"). The Merger Agreement easily satisfies this requirement: it was negotiated across state lines, it embodies an agreement between individuals and entities from Pennsylvania, New Jersey, and Massachusetts, and it effected the transfer of

a corporation engaged in interstate commerce. *See* Nicholas Cert. at ¶ 3. Thus, the FAA and its tenets guide this Court in its assessment of the arbitrability of plaintiffs' first three counts.

The FAA requires a district court to hear an action brought by "[a] party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration." 9 U.S.C. § 4. It also authorizes courts to order reluctant parties to arbitrate if, after hearing the parties, it is "satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue." *Id.* "If the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue," however, "the court shall proceed summarily to the trial thereof." *Id.*

■ Where, as here, the party "refus[ing] to perform" places "in issue" whether the dispute is within the contractual arbitration provision, a court must "engage in a limited review to ensure that the dispute is arbitrable—i.e., that ... the specific dispute falls within the substantive scope of that agreement." *PaineWebber, Inc. v. Hartmann,* 921 F.2d 507, 511 (3d Cir.1990); *see also AT & T Techs. v. Communications Workers,* 475 U.S. 643, 649, 106 S.Ct. 1415, 1418, 89 L.Ed.2d 648 (1986). If a court determines that the dispute falls within the substantive scope of the agreement, it must stay arbitrable counts, *see* 9 U.S.C. § 3, and "refer the matter to arbitration without considering the merits of the dispute." *PaineWebber,* 921 F.2d at 511; *see also AT & T Techs.,* 475 U.S. at 649–50, 106 S.Ct. at 1418–19.

■ In making this determination, courts must operate under a "presumption of arbitrability in the sense that '[a]n order to arbitrate the particular grievance should not be denied unless it may be said with positive

---

**6.** Plaintiffs' complaint omits the second alleged misrepresentation, relating to Naphoptic–A, but almost verbatim repeats the first and third through sixth alleged misrepresentations. *Compare* Defendants' Ex. 2 *with* Complaint at ¶ 3(a)–(e).

**7.** The GMP litigation, referenced in plaintiffs' complaint and the Merger Agreement, involved

Optopics and GMP Systems, Inc., among others. The litigation concluded with a settlement in which Optopics received $477,601.89 after reductions for litigation expenses. *See* Complaint at ¶ 78. The favorable settlement triggers § 5A of the Merger Agreement, obligating plaintiffs to issue defendants additional shares of Nutramax Products. *See* Merger Agreement § 5A(a), (d).

assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *AT & T Techs.*, 475 U.S. at 650, 106 S.Ct. at 1419 (quoting *Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582–83, 80 S.Ct. 1347, 1353–54, 4 L.Ed.2d 1409 (1960)).[8] However, where an agreement to arbitrate is limited in its substantive scope, courts should not allow " 'the federal policy favoring arbitration ... to override the will of the parties by giving the arbitration clause greater coverage than the parties intended.' " *PaineWebber*, 921 F.2d at 513 (quoting *National R.R. Passenger Corp. v. Boston & Maine Corp.*, 850 F.2d 756, 760–61 (D.C.Cir.1988)); *see also First Options of Chicago, Inc. v. Kaplan*, —— U.S. ——, ——, 115 S.Ct. 1920, 1924, 131 L.Ed.2d 985 (1995) (deeming arbitration "a way to resolve those disputes—but only those disputes—that the parties have agreed to submit to arbitration").

On its face, the arbitration clause in the Merger Agreement only applies to the indemnification rights contained in § 13. Prior to closing, there is little need for dispute resolution mechanisms since Nutramax can unilaterally terminate the merger if dissatisfied with Optopics's affairs. *See* Merger Agreement at § 11 (containing Nutramax's absolute right of termination).[9] After closing, however, the indemnification rights and obligations are the most significant contract provisions which might require a dispute resolution mechanism. Thus, what might appear to be a limited arbitration clause in fact encompasses most of the contract disputes which might arise.

Plaintiff's desire to avoid arbitration is clear and unmistakable. The grounds for this opposition are murkier. Plaintiffs concede that the issue of set-off is arbitrable and express a willingness to go to arbitration on that issue. *See* Plaintiffs' Br. at 19–20. However, they argue that none of the counts in the complaint is arbitrable. As to the indemnification and breach of contract claims in the first two counts, this argument is difficult to fathom. Count one specifically references § 13 of the merger agreement as well as plaintiffs' right to possession of the 24,219 shares of Nutramax stock still held in escrow. *See* Complaint at ¶ 87. Indeed, plaintiffs' first count is little different from their formal notice of intent to set-off, *see* Defendants' Ex. 2, which both defendants and plaintiffs' corporate counsel understood to implicate the arbitration provisions of the Merger Agreement and trigger various actions and events. *See, e.g.,* Defendants' Exs. 3–5 (deeming the arbitration clause's technical "notice" and "contest" provisions satisfied); Defendants' Ex. 6 (expressing plaintiffs' hope to settle the disputed claims "without the need to progress ... into arbitration"). Moreover, consistent with this mutual understanding, plaintiffs have frozen and held much of defendants' escrowed merger proceeds for over two years with a view towards an eventual set-off.[10]

There also is no doubt that the second count for breach of contract is likewise arbitrable. Not only is this claim based on the same facts as the first count, but an inaccuracy of a warranty or representation known to sellers is clearly a breach of contract. Indeed, as § 9(c) of the Merger Agreement specifically provides,

> The representations and warranties and covenants of [sellers] contained in this Agreement shall be true and correct in all respects at Closing as though such repre-

---

**8.** Complimenting the federal policy favoring arbitration in the instant case is the "common-law rule of contract interpretation that a court should construe ambiguous language against the interest of the party that drafted it"—plaintiffs. *Mastrobuono v. Shearson Lehman Hutton, Inc.*, —— U.S. ——, ——, 115 S.Ct. 1212, 1219, 131 L.Ed.2d 76 (1995); *see also* Restatement (Second) of Contracts § 206 (1979).

**9.** Indeed, by virtue of Nutramax's absolute out, prior to closing the Merger Agreement is not really an executory contract. A sweeping arbitration clause, encompassing all disputes "aris-

ing out of" or "relating to" the Merger Agreement, *see, e.g., Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 5, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983), might conflict with this absolute right of termination. After closing, the only binding executory obligations are the contingent indemnification liabilities and the GMP litigation share recalculation.

**10.** Plaintiffs have similarly held the proceeds from the GMP litigation in anticipation of an eventual set-off. *See* Complaint at ¶ 81.

sentations and warranties and covenants were made at such time.[11]

To the extent that one can extract a rational core from plaintiff's briefs and affidavits, the argument for non-arbitribility seems to arise from the contract language which allows plaintiff the right to pursue defendants for amounts in excess of the value of the set-off right:

> To the extent that there shall be insufficient such sums [from sale of the escrowed shares] available to compensate Nutramax fully for any indemnification to which it may be entitled, Nutramax shall have the right to pursue any and all other remedies available to it against [defendants].

Merger Agreement at § 13(e). Thus, plaintiff argues that because it is seeking damages far above the value of the escrowed shares, the right of set-off is not implicated for the excess and there can be no arbitration for that amount. Plaintiff appears to envision set-off arbitration and damage litigation proceeding simultaneously, even though the liability issues in both proceedings would be essentially identical. Neither common sense, the language of the Merger Agreement, nor efficient use of judicial resources suggests such a result.

This reading places the remedy cart before the liability horse. The Merger Agreement plainly envisions an arbitration panel, and not the courts, adjudicating the merits of contested claims for indemnification. *See id.* ("[C]ontested set-off shall be settled by arbitration."). Indeed, plaintiffs may "pursue ... other remedies" based on those arbitrable claims, but only after a favorable arbitration decision exceeding the value of defendants' escrowed shares. *Id.* Thus, a favorable arbitration decision "entitles" plaintiffs to indemnification within the meaning of the arbitration clause and, should defendants' escrowed shares prove insufficient, plaintiffs may thereafter collect the shortfall directly from defendants.[12] Indeed, even with a vivid imagination one cannot know at the time the arbitration process is started whether an arbitration award will exceed the value of the escrowed shares. The Court will not construe a contract to avoid a clearly negotiated arbitration clause based solely on a party's assertion regarding the size of the claim.[13]

Plaintiffs' reading of the arbitration clause also confuses arbitrability of claims with remedies by which to satisfy those claims. Applying plaintiffs' logic creates the following anomaly: If defendants' escrowed shares had a value of $100,000.00 and plaintiff suffered only $100,000.00 or less in damages, the indemnification claim would fall squarely within the arbitration clause. However, if defendants' escrowed shares had the same value but plaintiffs suffered $100,000.01 in damages, the very same underlying claim would be both arbitrable and non-arbitrable. Pursuant to the Merger Agreement, an arbitration panel would resolve the first $100,000.00 of the indemnification claim and set off any award against defendants' escrowed shares. Without regard to, and perhaps earlier in time than, the arbitration panel's adjudication on the same merits, a federal court would independently resolve the parties' dis-

---

11. This provision is a condition precedent to Nutramax's obligation to close. If the representations and warranties and the indemnification obligation did not survive closing, Nutramax's might have no post-closing remedy. However, coupled with the survivor provisions, the accuracy representations and warranties becomes a continuing contractual obligation.

12. Even if the Court felt the excess claim non-arbitrable, the Court would stay the suit pending completion of the arbitration. Because arbitration decisions can have res judicata and collateral estoppel effects, *see Dean Witter Reynolds, Inc. v. Byrd,* 470 U.S. 213, 223, 105 S.Ct. 1238, 1243, 84 L.Ed.2d 158 (1985); *Gruntal & Co. v. Steinberg,* 854 F.Supp. 324, 337 (D.N.J.1994); Restatement (Second) of Judgments § 84 (1982), a collection suit for full compensation could be relatively quick and simple, and eliminate the risk of inconsistent arbitral and judicial adjudications. *See generally* 18 Charles Alan Wright, Arthur R. Miller, Edward H. Cooper, *Federal Practice and Procedure* § 4403 (2d ed. 1986) (articulating the policies behind res judicata and collateral estoppel).

13. If plaintiff truly believed that the "any and all other remedies" language in § 13(e) sufficed to avoid arbitration on claims which would not be satisfied by set-off, it could have easily released the escrowed stock to defendants and proceeded with the law suit. However, in this case plaintiff wants to retain its set-off rights in arbitration and sue in court on identical claims.

pute over the excess cent. Not only is such as to the first two counts a result nonsensically contrary to the applicable contract language, *see* Merger Agreement at § 13(e) (speaking in terms of claims, not remedies), but such a result would encourage the party seeking litigation rather than arbitration, in this case the plaintiff, to delay the arbitration process.

■ Nomenclature notwithstanding, plaintiffs' third count, which sounds in legal fraud, does little more than parrot the allegations of breached representations, warranties, and covenants from the first count, which in turn parrots the very language of the Merger Agreement. *See* Complaint at ¶ 94; *cf.* Merger Agreement at § 13(a)(i). The burden of proving legal fraud is far greater than proving the inaccuracy of a warranty or representation under the Merger agreement. Fraud would require an intent to deceive, *see Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del.1983) (requiring scienter—the intent to deceive); *Prosser and Keeton on the Law of Torts* 741–45 (W. Page Keeton ed., 5th ed. 1984) (same), while the Merger Agreement requires only that defendants had knowledge of the inaccuracy. *See* Merger Agreement at § 13(a)(1). It is thus difficult to see plaintiffs prevailing on the fraud claim and failing to succeed on the first two counts. Given the court's predilection in favor of arbitration, it is tempting to simply rule that the third count is arbitrable. *See AT & T Techs.*, 475 U.S. at 650, 106 S.Ct. at 1419 (counseling courts to resolve any doubts in favor of arbitration); *see also Mastrobuono*, —— U.S. at ——, 115 S.Ct. at 1219 (counseling courts to resolve any doubts against

the interest of an arbitration clause's drafters).

Since the complaint seems to have been drafted more to avoid arbitration than to elucidate a theory of fraud, the Court cannot with certainty determine whether the scope of this claim exceeds that which the parties agreed was arbitrable. The Court, however, will stay not only the first two counts but the third count as well, pending completion of the arbitration on counts one and two. *See* 9 U.S.C. § 3 (requiring courts to stay arbitrable counts pending arbitration); Merger Agreement at § 13(e) (contemplating such a procedure). The doctrines of issue and claim preclusion will probably resolve all or most of the fraud claim, and the Court will be spared the spectacle of parallel proceedings determining similar issues. *See* supra note 12. Both parties agree that the claim based on the settlement of the GMP is not arbitrable and the case will continue as to that issue.

### III. TRANSFER OF VENUE

■ Had plaintiffs filed suit in the district embracing the contractually chosen arbitration forum, this Court could now simply compel arbitration. *See* 9 U.S.C. § 4. However, for whatever reason, *see supra* note 5, plaintiffs filed suit in the District of New Jersey where jurisdictional and geographical obstacles preclude such direct action. *See* 9 U.S.C. § 4 (requiring compelled arbitration be held "within the district in which the petition for an order directing such arbitration is filed"); *Econo–Car Int'l, Inc. v. Antilles Car Rentals, Inc.*, 499 F.2d 1391, 1394 (3d Cir.1974); *Alpert v. Alphagraphics Franchising, Inc.*, 731 F.Supp. 685, 689 (D.N.J. 1990).[14] Thus, this Court must accomplish

---

14. Emphasizing this Court's inability to compel arbitration in Philadelphia, plaintiffs challenge this Court's authority to find their first three counts arbitrable. (Somewhat inconsistently, they do not contest this Court's authority to find their first three counts non-arbitrable.) Ignoring cases in which courts decide arbitrability despite lacking authority to compel arbitration, *see, e.g., Alpert*, 731 F.Supp. at 689, plaintiffs cite two recent cases for the proposition that courts without authority to compel arbitration cannot "direct its scope." *See Merrill Lynch, Pierce, Fenner & Smith v. Lauer*, 49 F.3d 323, 327, 329 (7th Cir.1995); *Bao*, 942 F.Supp. at 983 (citing *Lauer* with approval). Both deal with situations in which the contractual location of arbitration is

in one circuit and a party starts an action in another. Both cases hold that if the law in the circuit chosen for arbitration differs from that in the circuit where suit is started, the court should not render a decision at odds with the binding law of the circuit in which the arbitration will occur, particularly when such decision would result in the dismissal of some of the claims. Plaintiffs interpret these cases to preclude courts from "adjudicating the arbitrability of claims to be arbitrated outside its jurisdiction." Plaintiffs' Supp.Br. at 6. This Court finds *Lauer* and *Bao* not on point and plaintiffs' argument for extending their holdings unpersuasive. In simple terms these cases simply hold that a choice of forum

the goals of the FAA and give effect to the intent of the Merger Agreement more indirectly, either by staying proceedings so that defendants can file anew in the Eastern District of Pennsylvania, or by transferring this action there pursuant to 28 U.S.C. §§ 1404(a) or 1406(a). *See Alpert,* 731 F.Supp. at 689 (staying proceedings to allow movants to petition an authorized court to compel arbitration); *Bao v. Gruntal & Co.,* 942 F.Supp. 978, 983 (D.N.J.1996) (transferring venue to a district authorized to compel arbitration). To conserve judicial resources and avoid multiplicitous litigation, this Court opts for the latter course, and will transfer this action to the Eastern District of Pennsylvania pursuant to 28 U.S.C. 1404(a).

"For the convenience of parties and witnesses [and] in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a). The Eastern District of Pennsylvania qualifies as such a district: each defendant is a citizen of Pennsylvania—Lilex Partners is a limited partnership comprised of a Pennsylvania citizen and Lilex Corporation, a Pennsylvania corporation with its principal place of business in Pennsylvania—and thus venue is proper there under 28 U.S.C. § 1391(a)(1) (setting forth proper venue in diversity actions). *See* Complaint at ¶¶ 6–10.[15]

■ In deciding motions to transfer venue, courts have not limited their consideration to the three factors enumerated in § 1404(a). Rather, courts have considered " 'all relevant factors to determine whether on balance the litigation would more conveniently proceed and the interests of justice be better served by transfer to a different forum.' " *Jumara v. State Farm Ins. Co.,* 55 F.3d 873, 879 (3d Cir.1995) (quoting 15 Wright et al., *supra,* § 3847). These include private interests— the parties' preferences, whether the claim

arose elsewhere, the convenience of the parties, the convenience of the witnesses, and the location of documents (to the extent that files could not be produced in the alternative forum)—and public interests—enforceability of the judgment, practical considerations that could make the trial easy, expeditious, or inexpensive, relative administrative difficulty in the two fora resulting from court congestion, the local interest in deciding local controversies at home, relevant public policies of the fora, and the familiarity of the trial judge with state law if applicable. *See Jumara,* 55 F.3d at 879; 1A:2 James W. Moore & Brett A. Ringle, *Federal Practice* ¶ 0.345[5]; Wright et al., *supra,* § 3854.

■ Within this framework, arbitration clauses are manifestations of the parties' preferences as to a convenient forum. *See Stewart Org., Inc. v. Ricoh Corp.,* 487 U.S. 22, 36, 108 S.Ct. 2239, 2247, 101 L.Ed.2d 22 (1988) (Scalia, J., dissenting) (considering an arbitration clause "a kind of forum selection clause"); *Scherk v. Alberto–Culver Co.,* 417 U.S. 506, 519, 94 S.Ct. 2449, 2457, 41 L.Ed.2d 270 (1974) ("An agreement to arbitrate before a specified tribunal is, in effect, a specialized kind of forum-selection clause that posits not only the situs of suit but also the procedure to be used in resolving the dispute."); *Jumara,* 55 F.3d at 880 (deeming forum selection clauses "manifestations of parties' preferences as to a convenient forum"). As such, they are entitled to "substantial consideration." *Id.* (giving substantial, yet not dispositive, weight to "the parties' agreement as to the most proper forum"). Thus, while courts normally defer to a plaintiff's choice of forum and a movant normally must bear the burden of establishing a need for transfer, such deference and burden-placement are inappropriate here, where plaintiffs have already freely contrac-

---

for arbitration carries with it a choice of the binding law of that jurisdiction. This choice cannot be frustrated by decisions made by a court in another circuit applying different rules of law. Here the transferor and transferee districts are both in the Third Circuit and the contract is, in any case, governed by Delaware law.

**15.** Although defendants briefed this Court's venue-transfer options, they expressed a preference

that this Court stay the proceedings (so that they can file a separate action) to deprive plaintiffs of another appealable issue and therefore another opportunity to delay resolution of this matter. *See supra* notes 3–5 (documenting plaintiffs' delay tactics); Defendants' Supp.Br. at 4–5 (preferring not to run the risk of transferring venue fearing further delays).

tually chosen an appropriate venue. *See id.* (placing on plaintiff the "burden of demonstrating why they should not be bound by their contractual choice of forum").[16]

Placing "substantial weight" on the parties' original choice of forum as expressed in the arbitration clause, the Court must now consider and balance the remaining factors. Considering the private factors first, the convenience of the parties and witnesses and the availability of documents do not favor either forum. The Eastern District of Pennsylvania, at Sixth and Market in Philadelphia, is but a short drive or train ride from this Court's Camden Vicinage, and plaintiffs do not contend that New Jersey witnesses or documents will be unavailable to Pennsylvania courts or arbitrators. *See id.* at 879 (considering the convenience of witnesses and the location of books and records "only to the extent that the witnesses may actually be unavailable" and "the files could not be produced" in the alternate forum).[17] The last private factor, where the cause of action arose, weighs against transfer to the Eastern District: although the parties negotiated the merger transaction across state lines in three states, several meetings at which defendants allegedly misrepresented and breached, took place in New Jersey, at Optopics's facility in Fairton, New Jersey, or with Nutramax Products's president in Pennsauken, New Jersey. *See* Nicholas Cert. at ¶ 3.

The public factors strongly support a transfer to the Eastern District of Pennsylvania. Whereas this Court's lacks the authority to compel arbitration under 9 U.S.C. § 4, the Eastern District of Pennsylvania faces no such obstacle. By virtue of this added authority, proceedings in the Eastern District would be easier, more expeditious, and, as a result, less expensive. The remaining public factors fail to favor either forum: the public policies of both fora derive from federal law, *see* FAA, 9 U.S.C. §§ 1–16, and the Merger Agreement purports to be governed by Delaware law, *see* Merger Agreement at § 32. Moreover, it cannot be said that the sale of a New Jersey-based, Delaware-incorporated entity by Pennsylvania citizens to a Massachusetts-based, Delaware-incorporated entity is a "local controversy" of any of these states that ought be decided at home.[18]

In sum, plaintiffs fall far short of the showing of convenience necessary to overcome the presumption established by their forum-selecting arbitration clause. *See Jumara,* 55 F.3d at 880 (placing on plaintiff "the burden of demonstrating why they should not be bound to their contractual choice of forum"). Neither witness convenience, nor party convenience, nor the interests-of-justice factors counsel in favor of maintaining the instant action in the District of New Jersey. Indeed, most of them either militate in favor of transferring venue or are inconclusive as to the two alternative fora. This Court will therefore transfer venue to the Eastern District of Pennsylvania pursuant to 28 U.S.C.

---

16. In their supplemental brief to this Court, plaintiffs misstate the law governing transfers of venue. While plaintiffs correctly cite *Jumara* for the propositions that plaintiff's choice of venue benefits from a presumption of correctness, and that the moving party bears the burden of proving the alternative forum superior, *see* Plaintiffs' Supp.Br. at 8–9 (citing *Jumara,* 55 F.3d at 879), they neglect to disclose the applicable exception to those propositions, found on *Jumara's* very next page, placing the burden on them:

   [W]hile courts normally defer to a plaintiff's choice of forum, such deference is inappropriate where the plaintiff has already freely contractually chosen an appropriate venue.... [Thus,] the plaintiffs bear the burden of demonstrating why they should not be bound by their contractual choice of forum.

   *Jumara,* 55 F.3d at 880; *cf. Golden Eagle Distrib. Co. v. Burroughs Corp.,* 801 F.2d 1531, 1535,

1542 (9th Cir.1986) (contemplating Rule 11 sanctions for misleading legal arguments and citing Model Rule of Professional Conduct 3.3 (duty of candor)); *Roadway Express, Inc. v. Piper,* 447 U.S. 752, 767, 100 S.Ct. 2455, 2464, 65 L.Ed.2d 488 (1980) (validating a court's inherent power to sanction parties for bad-faith conduct).

17. Further muting any geographic inconvenience to plaintiffs is the Philadelphia main office of their counsel, Dechert Price & Rhoads, blocks from the Eastern District of Pennsylvania's federal courthouse. *Cf. id.* at 882 n. 6 (considering the convenience of a party's counsel in a § 1404(a) determination).

18. This Court's decision to refer plaintiffs' first two counts to arbitration and stay the third more or less alleviates plaintiffs' expressed concern over imposing jury duty on Pennsylvania residents "with no connection to Optopics."

§ 1404(a) so that that court may compel arbitration before the contractually chosen Philadelphia tribunal.

## IV. CONCLUSION

This Court finds plaintiffs' first two counts within the scope of the Merger Agreement's arbitration clause and further finds that the third count should be stayed pending the outcome of that arbitration. Because it lacks the authority to compel arbitration in the contractually chosen forum of Philadelphia, the Court will transfer the case to the Eastern District of Pennsylvania pursuant to 28 U.S.C. § 1404(a). Defendants' motion to compel arbitration will therefore be granted to the extent that (a) counts one and two are determined to be arbitrable and (b) counts one, two, and three will be stayed pending completion of that arbitration. However, the court declines to order arbitration in Philadelphia for lack of statutory authority. Defendants may refile their motion to compel arbitration before the Eastern District of Pennsylvania which has the statutory authority needed to compel arbitration. An appropriate order will issue on even date herewith.

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO COMPEL ARBITRATION

For the reasons set forth in a written opinion of even date herewith,

**IT IS** on this 9th day of December, 1996

**ORDERED THAT:**

1. Counts one and two of plaintiffs' complaint are found arbitrable and counts one, two, and three are hereby **STAYED** pending the completion of arbitration;

2. Defendants' motion to compel arbitration in Philadelphia, Pennsylvania is hereby **DENIED** for want of statutory authority; and

3. The above-captioned matter is hereby **TRANSFERRED** in its entirety to the Eastern District of Pennsylvania pursuant to 28 U.S.C. § 1404(a).