

1998 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-10-1998

# Independent Assoc of Continental Pilots v. Cont Airlines

Precedential or Non-Precedential:

Docket 97-7282

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

Recommended Citation

"Independent Assoc of Continental Pilots v. Cont Airlines" (1998). *1998 Decisions.* Paper 226.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/226

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed September 10, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 97-7282

INDEPENDENT ASSOCIATION OF CONTINENTAL PILOTS

v.

CONTINENTAL AIRLINES, a Delaware Corporation

      Independent Association
      of Continental Pilots ("IACP"),

      Appellant

On Appeal from the United States District Court
for the District of Delaware
D.C. Civil No. 96-cv-00389

Argued: January 22, 1998

Before: BECKER, Chief Judge, STAPLETON, Circuit  Judge
and POLLAK, District Judge*

(Filed: September 10, 1998)

Roland P. Wilder, Jr. (argued)
Christy Concannon
Baptiste & Wilder, P.C.
1150 Connecticut Avenue, N.W.
Suite 500
Washington, DC 20036

 Attorneys for Appellant

_____

* Honorable Louis H. Pollak, United States District Judge for the Eastern
District of Pennsylvania, sitting by designation.

Jon A. Geier (argued)
Margaret H. Spurlin
Paul, Hastings, Janofsky &
 Walker LLP
1299 Pennsylvania Avenue, N.W.
10th Floor
Washington, DC 20004-2400

Josy W. Ingersoll
Laura D. Jones
Robert S. Brady
Young, Conaway, Stargatt & Taylor
Rodney Square North, 11th Floor
P.O. Box 391
Wilmington, DE 19899

Margaret Coullard Phillips
Continental Airlines, Inc.
Post Office Box 4607
Houston, Texas 77210-4607

 Attorneys for Appellees

OPINION OF THE COURT

POLLAK, District Judge.

This appeal concerns the allocation of authority between judicial and arbitral tribunals under the Railway Labor Act, 45 U.S.C. S 151 et seq. The International Association of Continental Pilots (IACP) brought this action against Continental Airlines, Inc. ("Continental") in the District Court for the District of Delaware, seeking a declaration and order directing that (1) Continental was required to arbitrate the merits of an issue assertedly raised in an employee's grievance, and (2) the grievance should be submitted to the arbitral tribunal on a class-wide basis. Continental counterclaimed, seeking an order directing that the arbitral tribunal determine the issues the IACP sought determination of by the district court. Thereafter Continental moved for judgment on the pleadings. That motion was granted and the case was dismissed. The IACP

2

has appealed the district court's order granting judgment on the pleadings. For the reasons set forth below, we affirm.

I.

We rehearse the facts as set forth in IACP's complaint and brief on appeal. In 1992, after Continental filed its second petition for protection under Chapter 11 of the bankruptcy code, the airline froze, and then sought to reduce, the pay of its pilots. In response to the airline's announcement of its intent to reduce pilots' pay, a group of pilots undertook negotiations with the airline's management; these talks resulted in a written agreement, the "Cost Reduction Memorandum" ("CRM"). Paragraph 6(A) of the CRM made provision for the phased restoration, according to an agreed-upon formula, of any reduction in pilot pay:

> The wage reductions (i.e. fuel bonus, line divisor, training, per diem, and crew meals) . . . will be restored progressively by Continental, in accordance with the formula set forth in Attachment A, with full restoration projected by July 1, 1993. As part of the restoration, the program of quarterly fuel bonus payments to pilots shall end, and in lieu thereof pilots rates of pay progressively restored shall be . . . the April 1, 1992 rates of pay.

Paragraph 6(B) of the CRM (the so-called "me-too" provision) provided that, until the pilots' pay was restored according to paragraph 6(A), if the airline granted a raise to any employee group other than the pilots, the pilots would receive a comparable wage increase:

> Should Continental grant a wage or salary increase to any employee group, including management and executive employees, prior to restoration of pilot wage reductions, then the company shall at the same time restore pilot wages on a comparable basis.

In late 1993, after the airline and the pilots' group entered into this agreement, the IACP was certified as the bargaining unit for the pilots. The CRM continued to be operative until Continental and the IACP executed their first collective bargaining agreement.

After the IACP was certified as the pilots' bargaining representative, the airline and the union entered into an agreement entitled the "Interim Grievance Procedure" ("IGP") pending the completion of the parties'first collective bargaining agreement. In accordance with S 204 of the Railway Labor Act, 45 U.S.C. S 184, the IGP established a system board of adjustment ("System Board") for the arbitration of grievances.1 The grievance procedure contemplated by the IGP consisted of two preliminary stages--denominated as "Step I" and "Step II" hearings-- followed by appeal to the system board of adjustment of any grievance not resolved in the first two stages.

On September 9, 1994--after implementation of the IGP but before the effective date of the first collective bargaining agreement--pilot Jackson Martin filed a grievance stating:

> The Cost Reduction Memorandum establishes that fuel bonus will be restored, it establishes a protocol for the use of a higher hourly rate in lieu of quarterly fuel bonus payments and it defines Continental's total liability toward restoration of pilot wage reductions to April 1, 1992 pay rates plus the value of the fuel bonus program. Continental Airlines should honor the Agreement it reached with its pilots under the Cost Reduction Memorandum and fully restore pilot wage reductions; to not do so would substantially alter the letter and intent of the current Pilot Employment Policy.

Martin pursued his grievance, unsuccessfully, through the first two steps of the grievance procedure. On January 4, 1995, Martin filed a notice of appeal to the System Board. On February 8, 1995, the IACP refiled Martin's appeal, stating "herewith is submitted the grievancefiled on behalf of Jackson Martin and all other similarly situated

_____

1. Section 204 of the Railway Labor Act is among the amendments to the statute that extended its coverage to the airline industry. This provision declares that "it shall be the duty of every carrier and of its employees, acting through their representatives . . . to establish a board of adjustment." 45 U.S.C. S 184. A "board of adjustment" so established is an arbitral tribunal to which the parties may refer any grievances that are not otherwise resolved. Id.

Continental Airlines pilots." The IACP's appeal formulated the question at issue as "whether the Company is in violation of the Cost Reduction Memorandum . . . and all related provisions for failure to properly enact pilot pay restoration rate effective July 1, 1994."

Prior to the arbitration hearing, Continental took the position that (1) the IACP could not bring the appeal on behalf of similarly situated pilots, and (2) the System Board could not entertain the merits of any claim under paragraph 6(B) of the CRM (the "me too" provision) because Martin had not invoked this provision at the earlier stages of the grievance proceeding. When the arbitration hearing commenced, the IACP announced that it refused to proceed unless Continental agreed that any determination made by the arbitrator with respect to Martin's waiver of the "me too" provision or the IACP's right to raise claims for similarly situated pilots would be reviewable de novo by a federal court. When Continental refused to make this concession, the IACP voiced its intent to go to court to secure a judicial determination of the two issues. The arbitrator thereupon ended the hearing.

The IACP brought suit in the district court, seeking an order (1) declaring that Continental was required to arbitrate the issue of whether the airline violated paragraph 6(B) of the CRM, and (2) compelling Continental to accept the System Board's authority to resolve the paragraph 6(B) issue on a class-wide basis. Continental counterclaimed, seeking an order remanding for arbitration by the System Board the issues IACP sought to have the district court determine. Continental then moved for judgment on the pleadings, urging that the IACP's complaint sought judicial determination of issues that properly should be addressed by the System Board as part of its overall arbitration of the Martin grievance as recast by the IACP--the issues the IACP requested judicial determination of being whether the System Board should entertain the merits of a claim under paragraph 6(B) and whether any relief awarded pursuant to paragraph 6(B) should inure to all similarly situated pilots. In opposition to Continental's motion for judgment on the pleadings, the IACP urged that these were issues of "substantive arbitrability" for the court to decide in advance

5

of arbitration. The district court granted Continental's motion for judgment on the pleadings, stating in its order that "[t]he case is dismissed." IACP then brought this appeal. Our review of the district court's decision is plenary. Jablonski v. Pan American World Airways Inc., 863 F.2d 289, 290 (3d Cir. 1988).

II.

In order to bring the questions posed in this appeal into sharper focus, it may be useful to review the statutory setting within which these questions arise. The Railway Labor Act ("RLA") was enacted in 1926 to provide "a comprehensive framework for the resolution of labor disputes in the railroad industry." Atchison Topeka & Santa Fe Ry. Co. v. Buell, 480 U.S. 557, 562–63 (1987). Among the "[g]eneral purposes" of the legislation, as set forth in the 1934 amendments to the statute, are "[t]o avoid any interruption to commerce or to the operation of any carrier engaged therein" and "to provide for the prompt and orderly settlement of all disputes growing out of grievances or out of the interpretation or application of agreements covering rates of pay, rules or working conditions." Act of June 21, 1934, ch. 691 S 2, 48 Stat. 1185, 1186–87 (codified at 45 U.S.C. S 151a). To these ends, the legislation, as amended in 1934, required the establishment of an arbitral tribunal, denominated "the National Railroad Adjustment Board," for the resolution of such disputes, and authorized carriers and their employees to create "system, group, or regional boards" for the resolution of such controversies, provided that any party dissatisfied with the decision of a subordinate tribunal might still present the grievance to the National Board.2 RLA S 3, 45 U.S.C. S 153.

_____

2. The RLA was the product of the joint efforts of labor and industry representatives, who drafted the legislation in an effort to correct the weaknesses of the Transportation Act of 1920, 41 Stat. 456, a statute which provided for the establishment of adjustment boards to hear disputes, but did not require the establishment of such boards nor render their awards judicially enforceable. See International Association of Machinists v. Street, 367 U.S. 740, 758 (1961); Katherine Van Wezel Stone, Labor Relations on the Airlines: The Railway Labor Act in the Era

6

In 1936, the RLA was amended to cover the infant airline industry. Act of April 10, 1936, ch. 166, 49 Stat. 1189 (codified at 45 U.S.C. S 181). As amended, all provisions of the RLA, save S 3, 45 U.S.C. S 153--the provision creating the National Railroad Adjustment Board--apply to airlines and their employees. 45 U.S.C. S 181. In so amending the statute, Congress deferred the issue of whether to establish a national adjustment board for the airline industry, and empowered the National Mediation Board ("NMB") to determine when the creation of such a board would be appropriate. 45 U.S.C. S 185. The NMB has not yet made such a determination.

As amended, the RLA directs air carriers and their unions to establish arbitral tribunals--"system, group, or regional boards"--for the resolution of "disputes between an employee or group of employees and a carrier or carriers by air growing out of grievances, or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions." 45 U.S.C. S 184. The statute requires that such a dispute "be handled in the usual manner up to and including the chief operating officer of the carrier designated to handle such disputes; but, in the event of failure to reach an adjustment in this manner, the dispute may be referred by petition of the parties or by either party to an appropriate adjustment board." Id. Consequently, until a national adjustment board is created for the airline industry, a decision rendered by a "system, group or regional board" is the terminal stop in the pre-judicial grievance process. Id. Once the appropriate adjustment

_____

of Deregulation, 42 Stan. L. Rev. 1485, 1498 (1990). The 1926 legislation made it the "duty of all carriers, their officers, agents, and employees . . . to settle all disputes," and mandated the establishment of system boards for the resolution of disputes. Railway Labor Act, ch. 347 SS 2-3, 44 Stat. 577, 577-78 (1926). But when the requirements of the 1926 legislation proved to be easily evaded, further labor and management dissatisfaction with the process led to amendments in 1934, strengthening the dispute-resolution provisions of the statute. Act of June 21, 1934, ch. 691 S 2, 48 Stat. 1186. The history leading up to the 1934 amendments is recounted in Elgin, Joliet & Eastern Railway Co. v. Burley, 325 U.S. 711, 725-26 (1945).

board enters an award, its decision is enforceable in the federal courts, see International Ass'n of Machinists v. Central Airlines, 372 U.S. 682, 685 (1963), and is subject to narrow judicial review. Bower v. Eastern Airlines, 214 F.2d 623, 625 (3d Cir. 1954).

As the foregoing summary makes plain, the RLA's dispute-resolution machinery is central to the statutory scheme. As set forth in the statute, and elaborated by Supreme Court precedent, the RLA regime governs three different types of disputes: "representation disputes" (disputes concerning the selection of collective-bargaining representatives), "major disputes," and "minor disputes." Depending upon the type of dispute involved, the RLA regime imposes different procedural requirements on the parties and prescribes different dispute-resolution fora.3 This appeal concerns "major disputes" and "minor disputes."

Under the RLA, questions about whether a dispute is subject to arbitration are usually answered with reference to the distinction between "major" and "minor" disputes: "minor disputes" are resolved through arbitration (by the system boards in the case of the airline industry or by the National Railroad Adjustment Board in the railroad

_____

3. "Representation disputes" are committed to the exclusive jurisdiction of the National Mediation Board. 45 U.S.C. S 152 Ninth; Switchmen's Union v. National Mediation Board, 320 U.S. 297, 302 (1943). Major and minor disputes involve, respectively, efforts to secure and to implement contractual rights; these distinctions will be discussed more fully in the text. Further, it should be noted that certain of the rights and correlative
obligations created by the RLA--particularly the provisions ensuring the free choice of bargaining representatives found in Section 2 of the statute, 45 U.S.C. S 152--are also enforceable in federal court. Because the RLA (unlike the National Labor Relations Act) has not established an administrative body for the enforcement of statutory rights, certain of the
rights created by the statute are enforceable in the courts. See, e.g., Virginian Ry. v. System Fed'n No. 40, 300 U.S. 515, 544 (1937)(duty to negotiate judicially enforceable); Texas & New Orleans Railroad v. Railway & Steamship Clerks, 281 U.S. 548, 567 (1930)(right to free choice of bargaining representative judicially enforceable). Although a leading treatise on the RLA--The Railway Labor Act (Douglas Leslie, ed. 1994)--refers, for analytic purposes, to disputes raising such issues as "statutory disputes," this label has not caught on in the courts.

8

industry) while "major disputes" are subject to a lengthy
process of bargaining and mediation.

The Supreme Court set forth the major/minor framework
in Elgin, Joliet & Eastern Railway Co. v. Burley, 325 U.S.
711 (1945).4 This classification scheme determines what
kind of dispute resolution mechanisms may be brought to
bear on the controversy and also determines the extent to
which the federal courts may become involved. Association
of Flight Attendants, AFL-CIO v. USAir, Inc., 960 F.2d 345,
348 (3d Cir. 1992).

The "major dispute" category, as the Supreme Court
explained in Burley, "relates to disputes over the formation
of collective agreements or efforts to secure them. They
arise where there is no such agreement or where it is
sought to change the terms of one, and therefore the issue
is not whether an existing agreement controls the
controversy." 325 U.S. at 723. If the parties are involved in
a major dispute, they must bargain over the issue; while
bargaining, the parties are required to maintain the status
quo and exhaust the lengthy mediation procedures set forth
in S 6 of the statute, 45 U.S.C. S 156, before they may
resort to self-help. Compliance with these requirements is
enforceable in the federal courts. Detroit & Toledo Shore
Line Railroad v. United Transportation Union, 396 U.S. 142,
149 (1969). If, upon the conclusion of the mediation
procedures, the parties are at an impasse, they may then
employ economic weapons (e.g., strikes or lockouts). See
Burley, 325 U.S. at 725, Consolidated Rail Corp. v. Railway
Labor Executives' Ass'n, 491 U.S. 299, 303 (1989).

While the major dispute category concerns efforts to
establish or change the terms of a collective bargaining
agreement, the minor dispute category, in the Burley
Court's formulation,

_____

4. The terms "major" and "minor" are not found within the RLA. The
Supreme Court first used the major/minor typology in the Burley
decision. In doing so, the Court adopted the nomenclature that had
developed within the railroad industry. See 325 U.S. at 723-28. As the
Court later clarified in Consolidated Rail Corp. v. Railway Labor
Executives' Ass'n, 491 U.S. 299, 305 (1989), the designations "major"
and "minor" are not to be understood as reflecting the relative
importance of particular labor controversies.

contemplates the existence of a collective bargaining agreement already concluded or, at any rate, a situation in which no effort is made to bring about a formal change in terms or to create a new one. The dispute relates either to the meaning or proper application of a particular provision with reference to a specific situation or to an omitted case. . . . . [T]he claim is to rights accrued, not merely to have new ones created for the future.

325 U.S. at 723. Minor disputes are subject to mandatory arbitration by the relevant board of adjustment, and may not be the subject matter of strikes and lockouts. Jurisdiction to entertain the merits of a minor dispute rests exclusively with the arbitral forum: "Congress considered it essential to keep these so-called `minor' disputes within the Adjustment Board and out of the courts." Union-Pacific Railroad Co. v. Sheehan, 439 U.S. 89, 94 (1978)(per curiam).

Although the Burley Court established the general contours of the distinction between major and minor disputes, it did not articulate a standard for differentiating the two. In Consolidated Rail Corp. v. Railway Labor Executives' Association, 491 U.S. 299 (1989) ("Conrail"), the Court undertook to advance the analysis. "[T]he line drawn in Burley," said the Conrail Court, "looks to whether a claim has been made that the terms of an existing agreement either establish or refute the presence of a right to take the disputed action. The distinguishing feature of [a minor dispute] is that the dispute may be conclusively resolved by interpreting the existing agreement." Id. at 305. Accordingly the Court adopted a standard that sought to synthesize the various verbal formulations adopted by the several courts of appeals that had addressed the issue: "Where an employer asserts a contractual right to take the contested action, the ensuing dispute is minor if the action is arguably justified by the terms of the parties' collective-bargaining agreement. Where, in contrast, the employer's claims are frivolous or obviously insubstantial, the dispute is major." Id. at 307.

III.

In the case at bar, the district court determined that the "underlying issues in this case"--Continental's alleged

10

violations of paragraphs 6(A) and 6(B) of the CRM--
"constitute minor disputes under the RLA." Slip opinion at
6. The district court then stated that "although the RLA
requires that minor disputes be settled in arbitration rather
than by strikes or by the federal courts, it does not prohibit
the parties to a collective bargaining agreement from setting
procedural limits to the system boards' jurisdiction.
Whether the parties have complied with the procedural
requirements of the collective bargaining agreement such
that the arbitrator may address the merits of a dispute is
a matter for the arbitrator to decide." Slip opinion at 8-9
(citation omitted). The district court went on to conclude
that the issues presented in the IACP's complaint "are
minor disputes" which "must, therefore be decided through
arbitration." Slip opinion at 9.

There is no doubt that, as a general matter, a dispute
over whether Continental violated paragraphs 6(A) and 6(B)
of the CRM is a minor, rather than major, dispute. And,
more particularly, there is no doubt that the issues posed
by the grievance relating to pilot wages filed by Jackson
Martin against Continental are issues of the sort that are
subject to arbitration by the board of adjustment. This
appeal focuses on the question whether the IACP's
recasting of the Martin grievance into one of broader scope
has introduced additional and antecedent issues that
should be resolved judicially as a predicate to arbitration or
whether those additional issues are themselves subject to
arbitration. Characterizing these issues as matters of
"substantive arbitrability," the IACP contends that they
must be resolved by the district court rather than by the
board of adjustment.5 In pressing this contention on
appeal, the IACP argues that the issues that it asked the
district court to resolve prior to arbitration--namely,
whether the alleged violation of paragraph 6(B) of the CRM
is properly before the arbitrator, and whether the 6(B)
question must be addressed on a class-wide basis--are

_____

5. On page 15 of its brief, the IACP attributes to the district court the
statement that "the doctrine of substantive arbitrability has no
application under the RLA." This language, however, appears neither on
the page to which the IACP's brief refers nor anywhere else in the
opinion.

11

questions of "substantive arbitrability" for the court to decide.

The term "substantive arbitrability" derives from National Labor Relations Act jurisprudence but has been utilized in other contexts. It is used to describe the question whether the parties' dispute involves a subject matter that is within the ambit of a contractual arbitration agreement. See John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 557–58 (1964); United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582–83 (1960). The Supreme Court used the term "substantive arbitrability" for the first time in John Wiley, a case arising under the NLRA, to differentiate "substantive" issues--whether the parties have agreed to arbitrate the subject matter of the dispute--from "procedural" issues--"whether grievance procedures or some part of them apply to a particular dispute, whether such procedures have been followed or excused, or whether the unexcused failure to follow them avoids the duty to arbitrate." 376 U.S. at 557–58. The question of "substantive arbitrability"--that is, "whether a collective bargaining-agreement creates a duty for the parties to arbitrate the particular grievance"--is, as the Supreme Court instructs, "undeniably an issue for judicial determination." AT & T Technologies, Inc. v. Communications Workers, 475 U.S. 643, 649 (1986). Issues of "procedural arbitrability," on the other hand, are for the arbitrator to decide. John Wiley, 376 U.S. at 558.

Responding to the IACP's contention that its complaint implicates issues of "substantive arbitrability" for the court to decide, Continental makes two arguments: The first argument is that, as the district court ruled, the IACP's complaint presents a minor dispute solely within the jurisdiction of the board of adjustment. The second argument is that the IACP's complaint raises questions not of "substantive arbitrability" but of "procedural arbitrability"--questions which are for the arbitrator to decide.

A. Does Continental's Complaint Present a "Minor Dispute"?

In urging the correctness of the district court's determination that the IACP's complaint presents a minor

12

dispute, Continental contends that the defenses that it advanced to the Martin grievance and to the IACP's proposed recasting of the grievance are defenses which, to use the terminology of Conrail--"[a] dispute is minor if the action is arguably justified by the terms of the parties' collective-bargaining agreement"--are "arguably justified" by, respectively, the Cost Reduction Memorandum ("CRM") and the Interim Grievance Procedure ("IGP"). Thus, in Continental's view, we need look no further than the definition of a minor dispute to resolve this case.

Although the Court's Conrail discussion of minor disputes is pertinent, we are called upon to answer a somewhat different question from that posed by the distinction between major and minor disputes. The function that a court performs when determining whether a dispute is major or minor is not the function that a court performs when deciding whether an issue is one of "substantive arbitrability" or "procedural arbitrability." As the Supreme Court has pointed out, the "arguably justified" standard announced in Conrail "was employed only for policing the line between major and minor disputes." Hawaiian Airlines, Inc. v. Norris, 512 U.S. 246, 265 (1994). That line determines which statutory route must be followed as between (1) bargaining, followed by compulsory mediation procedures under the auspices of the National Mediation Board, which procedures are judicially enforceable, and (2) binding arbitration, subject to limited judicial review. Thus, the major/minor question allocates the respective authority of the National Mediation Board on the one hand, and the arbitral boards of adjustment on the other, and also delineates the judiciary's role in each respective statutory path.6 See Burley, 325 U.S. at 722.

This appeal presents a related, but nonetheless different, question. It presents the question whether, in the adjudication of a dispute concededly to be decided by an

_____

6. The definition of a minor dispute also comes into play when determining whether a state-law claim raised by a worker covered by a collective bargaining agreement governed by the RLA is preempted. See Hawaiian Airlines, 512 U.S. at 265. But the preemption inquiry has no bearing on the case at bar.

arbitral tribunal (under the RLA, a board of adjustment), it is the arbitral tribunal or the court which determines the scope of the arbitration. To be more specific, a decision that the controversy about the adequacy of Continental's pilots' wages is a "minor" dispute sets the stage for a further question: Granted that Jackson Martin's grievance is arbitrable, are the additional issues posed by Continental's objections to the IACP's recasting of the Martin grievance matters to be decided by the district court or by the System Board?

Hence this appeal concerns not whether this case goes to arbitration (as opposed to another statutory route), but instead concerns what issues the arbitral tribunal should decide and on whose behalf those issues are to be decided: the IACP's complaint asks the court to determine (1) whether the arbitral tribunal must, in entertaining Martin's grievance, decide whether or not Continental violated paragraph 6(B) of the CRM (the "me-too" provision), and (2) whether the arbitral tribunal must decide that issue on a class-wide basis. It is the IACP's contention that these questions fall under the rubric of "substantive arbitrability" and thus must be decided by the court. Because this contention is not definitively answered one way or another via the major/minor distinction, we now turn to the question whether the IACP's complaint involves issues of "substantive" or "procedural" arbitrability.

B. Does the IACP's Complaint Raise Issues of "Substantive" or "Procedural" Arbitrability?

In support of its argument that its complaint raises questions of "substantive arbitrability," the IACP relies heavily on our discussion in PaineWebber v. Hartmann, 921 F.2d 507, 512-13 (3d Cir. 1990), and PaineWebber, Inc. v. Hofmann, 984 F.2d 1372, 1378 (3d Cir. 1993), two cases arising not under the RLA or the NLRA, but under the securities laws and the Federal Arbitration Act. In Hartmann and Hofmann, securities brokerage houses sued to enjoin the arbitration of customers' claims of fraud and mismanagement. Both cases concerned contractual language found in the arbitration provisions of the New York Stock Exchange rules and the National Association of Stock Dealers Code of Arbitration Procedure, to wit: "No

14

dispute, claim, or controversy shall be eligible for submission to arbitration . . . where six (6) years have elapsed from the occurrence or event giving rise to the act or dispute, claim or controversy." 921 F.2d at 509. Relying on the specific language, absent in the case at bar, relating to disputes "eligible for submission to arbitration," we held in Hartmann (and reiterated in Hofmann) that the application of the quoted provision was a question of "substantive arbitrability" for the court. 921 F.2d at 513; 984 F.2d at 1379. In Hartmann, however, we specifically noted the narrowness of our holding, stating that "[l]anguage less distinct than `eligible for submission to arbitration' might well be insufficient to overcome the strong jurisprudential pull toward arbitration." 921 F.2d at 514.

The IACP urges that the agreement in this case--and in particular the exhaustion requirement of the IGP--presents a "substantive bar" to arbitration such that our rulings in Hartmann and Hofmann apply. The IACP places principal reliance on language in the "Jurisdiction" portion of Section III of the IGP. The language relied on provides: "The System Board shall have authority to hear only matters which are within the scope of this Agreement and which have been handled through the prior steps of this grievance procedure." This is not, however, the only part of the agreement which sets forth exhaustion principles. In Section IV of the IGP, under the heading "General Provisions," the agreement states in relevant part:

> Unless the Company and the grievant or the IACP mutually agree otherwise, a grievant is precluded from raising in subsequent steps issues not raised in his original grievance. Further, the Step II Hearing Officer and System Board of Adjustment are precluded from considering issues not raised in the grievant's original grievance unless the Company and the grievant or the IACP mutually agree otherwise. Such issues may only be submitted as new grievances subject to all time limits, jurisdictional restrictions, and any other pertinent provisions of this Agreement.

We do not find the language of Sections III and IV of the IGP to be as "distinct" as the language at issue in the

15

Hartmann and Hofmann cases. The mere fact that the exhaustion provisions are framed in obligatory terms does not necessarily render the provisions a "substantive bar" requiring judicial, rather than arbitral, interpretation. In Belke v. Merrill Lynch, Pierce, Fenner & Smith, 693 F.2d 1023 (11th Cir. 1982), a case we referred to in Hartmann, the arbitration portion of the agreement between the investor and the broker read, in pertinent part, "Arbitration must be commenced within one year after the cause of action accrued." Id. at 1026 n.4. The Eleventh Circuit concluded that compliance with this provision was an issue for the arbitrator to decide. Id. at 1028. Noting that the provision at issue in Belke presented a "stark contrast" with the NYSE and NASD's "eligib[ility] for submission to arbitration" formulation, we observed in Hartmann that the Belke court "quite reasonably" held that"its application should be decided by the arbitrator." 921 F.2d at 513-14.

Even if the exhaustion provisions of the IGP could properly be read as approximating the distinctness of the Hartmann/Hofmann "eligible for submission to arbitration" provision, we would be slow to conclude that interpretation and application of the exhaustion provisions were matters for the district court rather than matters for the System Board. We think the case for judicial circumspection in defining the boundaries of the arbitral process is less compelling in the Hartmann/Hofmann setting, where the disputes to be addressed arise out of the relationship between a brokerage house and an individual customer, than in settings governed by a collective bargaining agreement which covers scores or hundreds or thousands or even tens of thousands of employees. In the collective bargaining setting, the primacy of the arbitral role is crucial to the stability of the work place. The Supreme Court made this plain almost forty years ago in United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 578 (1960):

> Thus, the run of arbitration cases, illustrated by Wilko v. Swan, 346 U.S. 427 [a securities case], becomes irrelevant to our problem. There the choice is between the adjudication of cases or controversies in courts with established procedures or even special statutory

16

> safeguards on the one hand and the settlement of them
> in the more informal arbitration tribunal on the other.
> In the commercial case, arbitration is the substitute for
> litigation. Here arbitration is the substitute for
> industrial strife. . . . For arbitration of labor disputes
> under collective bargaining agreements is part and
> parcel of the collective bargaining process itself.

Id. at 578.

A recent illustration of the centrality of arbitration in the collective bargaining context is our decision in Association of Flight Attendants v. USAir, 960 F.2d 345 (3d Cir. 1992). In Association of Flight Attendants, an RLA case, we were called upon to decide whether the district court erred in ruling that a particular item of evidence--the grievant's expunged criminal records--must be admitted in the arbitral proceeding. While finding that this issue could not correctly be characterized as presenting either a major or a minor dispute, we determined that the issue was one of procedure for the arbitrator to decide. Id. at 348-49.[7]

In so holding, we found guidance in John Wiley, which held that under the National Labor Relations Act, "[o]nce it is determined . . . that the parties have agreed to submit the subject matter of the dispute to arbitration, `procedural questions' which grow out of the dispute and bear on its final disposition should be left to the arbitrator." Id. at 557. Following the logic of John Wiley, we concluded in Association of Flight Attendants that the general subject matter of the dispute--i.e., the termination of the grievant-- was subject to arbitration and that the evidentiary question was one for the arbitrator to decide.[8]  960 F.2d 349-350.

_____

7. It bears noting that we decided Association of Flight Attendants after Hartmann.

8. The "procedural arbitrability" doctrine of John Wiley, long a mainstay of NLRA jurisprudence, has been held applicable to RLA cases by other courts of appeals as well. In Brotherhood [of] Railway Carmen v. Atchison, Topeka & Santa Fe Railway Co., 956 F.2d 156 (7th Cir. 1992), the court came to a conclusion similar to the one we reached in Association of Flight Attendants, albeit in a case arising in a different procedural posture. In that case, the union sued on the basis of an arbitral award entered in favor of a discharged employee by an RLA board of

17

In the case at bar, the IACP, in its first count for relief, asked the district court to rule that the arbitrator must determine the merits of the issue of whether Continental violated paragraph 6(B)--an issue which Continental contended, in advance of arbitration, was not previously raised in the grievance procedure. Thus the IACP requested a judicial determination of whether or not any applicable exhaustion requirement was met (and, if not, whether there was ground for excusing exhaustion). In doing so, IACP raised, in the RLA context, an argument which, in the NLRA context, the Supreme Court in John Wiley had occasion to reject. In John Wiley, the employer resisted arbitration of an employee's grievance on a number of grounds, one of which concerns us here: the employer's argument that the court should find arbitration precluded because the employee failed to exhaust the preliminary steps of the grievance procedure. 376 U.S. at 556 & n.11. Rejecting the employer's argument that it was for the court to decide the exhaustion issue (as well as the issue whether the grievance was timely instituted) the Court stated:

> Doubt whether grievance procedures or some part of
> them apply to a particular dispute, whether such

_____

adjustment. On appeal, the issue was whether the district court erred in ruling, in the first instance, that the employer "had waived its right to oppose the full award" because it failed to introduce the evidence that supported its opposition during arbitration. Id. at 158. The court held that the interpretation of the contractual provision relating to the manner in which grievances were to be presented to the arbitrators-- "each written submission shall be limited to the material submitted by the parties to the dispute [in the earlier stages of the grievance proceeding]"--was a procedural question for the arbitrators to decide. Id. at 158, 159. In doing so, the court pointed out that it is "customary for collective bargaining agreements to require the exhaustion of the preliminary stages of the grievance procedure before resorting to arbitration . . . for why establish remedies if the parties are free to bypass them?" Id. at 158. And in Larsen v. American Airlines, Inc., 313 F.2d 599 (2d Cir. 1963), the court noted "[W]here a labor agreement provides for arbitration or other internal resolution of disputes, this court has held that questions of `procedural arbitrability' are for the arbitrator" (citing Livingston v. John Wiley & Sons, Inc., 313 F.2d 52 (2d Cir. 1963), subsequently affirmed as John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543 (1964)).

18

procedures have been followed or excused, or whether the unexcused failure to follow them avoids the duty to arbitrate cannot ordinarily be answered without consideration of the merits of the dispute which is presented for arbitration. . . . . It would be a curious rule which required that intertwined issues of "substance" and "procedure" growing out of a single dispute and raising the same questions on the same facts had to be carved up between two different forums, one deciding after the other. Neither logic nor considerations of policy compel such a result.

376 U.S. at 557. We find this reasoning and result fully applicable to the case at bar.

The second issue raised in IACP's complaint, whether the arbitrator must entertain the Martin grievance on behalf of all pilots, is likewise an issue for the arbitrator to decide. This issue is not only "procedural" in nature, but also requires considerable investigation into the meaning of the parties' agreements. The IACP in effect requests that the court certify the grievance as a class action before the arbitrator proceeds to hear the case, a proposed party-joinder ruling that would be "procedural" as that term is normally understood. Furthermore, resolving this issue would involve an analysis of the interplay between the CRM's wage-restoration provision--paragraph 6(A)--and the "me too" provision--paragraph 6(B)--on the one hand, and the IGP's provisions governing the conduct of grievance proceedings on the other. If we were to assume that an arbitrator would find any applicable exhaustion requirement satisfied, then the arbitrator might also find within the language of the parties' agreements, as elucidated by the law of the shop, a basis for considering paragraph 6(B) claims to mandate or permit class-wide relief (that is to say, perhaps the "me too" clause is better understood as an "us too" clause). But such a determination requires a much more searching interpretation of the contract than the courts are permitted under the RLA. In this case, as in John Wiley, this procedural issue cannot "be answered without consideration of the merits of the dispute which is presented for arbitration." 376 U.S. at 557.

19

The IACP seeks not a determination of the subject matter covered by the agreement to arbitrate, but a judicial determination of the parameters and scope of the award that the system board may permissibly enter, that is, (1) whether the "me-too" clause was properly invoked (and if not, whether the union can interpolate this claim at the arbitral stage), and (2) whether the arbitrator has authority to grant relief on a class-wide basis. In the latter regard, it bears noting that Section III.B of the IGP contains the following general grant of remedial authority (also under the subheading "Jurisdiction"):

> The System Board shall have the authority to issue rulings and make awards necessary to compensate a pilot for actual damages suffered as a result of any policy violations it finds to have occurred. The System Board's jurisdiction to award damages is strictly limited to actual, compensatory damages, and does not include jurisdiction or authority to award damages in the nature of a penalty, i.e., punitive damages. The Board shall have the authority, however, to order a party to comply with any provision(s) of the [agreement] or policies as necessary to remedy or correct violations, or to require specific enforcement of a provision of the [agreement] or policies.

The interpretation of such remedial provisions is a task for which arbitrators conversant with industry practice are likely to be better suited than judges. Cf. Carey v. General Elec. Co., 315 F.2d 499, 508 (2d Cir. 1963)("We cannot divine now, nor do we deem it proper to predict, the precise form in which the arbitrator will frame his decree."), cert. denied, 377 U.S. 908 (1964).

When a court is called on to determine whether aspects of a dispute arising out of a collective bargaining agreement are to be determined by an arbitrator or by the court, judicial restraint is an institutional imperative. Excessive judicial intrusion can undermine arbitral expertise and authority.[9] Further, lengthy court proceedings can seriously

_____

9. "It is particularly underscored that the arbitral process in collective bargaining presupposes that the parties wanted the informed judgment of an arbitrator, precisely for the reason that judges cannot provide it." Concurring Opinion of Brennan, J., joined by Frankfurter and Harlan, JJ., in United Steelworkers of America v. American Manufacturing Company, 363 U.S. 564, 570 (1960).

20

undermine the capacity for prompt adjudication which is the hallmark of arbitration. As the Court cautioned in John Wiley,

> the opportunities for deliberate delay and the possibility of well-intentioned but no less serious delay created by separation of the "procedural" and "substantive" elements of a dispute are clear. . . . [S]uch delay may entirely eliminate the prospect of a speedy arbitrated settlement of the dispute, to the disadvantage of the parties (who, in addition, will have to bear increased costs) and contrary to the aims of national labor policy.

376 U.S. at 558.10

Accordingly, both of the matters raised by the IACP's complaint are questions of procedure for the arbitral tribunal to decide.

Conclusion

For the foregoing reasons, the judgment of the district court is affirmed.11

_____

10. As pointed out in Part II of this opinion, supra note 1, the RLA's provisions for arbitration by boards of adjustment were drafted in response to the Transportation Act's ineffectual dispute-resolution machinery; but even those procedures established by the original statute proved less than satisfactory. Before the RLA's mechanisms for resolving grievance and contract-application disputes were strengthened by the 1934 amendments to the statute, "parties were free at all times to go to court to settle [grievances]" and the intended dispute-resolution process broke down. Burley, 325 U.S. at 725-26. Consequently, the 1934 amendments created a compulsory arbitration system"to remove the settlement of grievances from this stagnating process and bring them within a general and inclusive plan of decision." Id. at 728. Hence it is unsurprising that the 1934 amendments were enacted under the title: "An Act to amend the Railway Labor Act approved May 20, 1926, and to provide for the prompt disposition of disputes between carriers and their employees." Act of June 21, 1934, ch. 691, 44 Stat. 577.

11. Continental concluded its brief on appeal with the recital that "the judgment [the judgment of the district court which granted Continental's

21

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit
_____

motion for judgment on the pleadings and recited that "[t]he case is dismissed"] should be affirmed." Continental has not asked this court to address the counterclaim it filed prior to moving for judgment on the pleadings. Whether that counterclaim has any continuing viability, or (as pointed out in the district court's memorandum opinion but not in the district court's order) vanished with the district court's grant of judgment
on the pleadings and consequent dismissal of the case, is not a question that is before this court. If this matter reaches the System Board of Adjustment, we presume that the threshold issues before the Board will be those identified in Continental's counterclaim, e.g., whether, under the Interim Grievance Procedure, (1) the IACP may bring a grievance on behalf of "similarly situated" pilots other than the individual pilot who filed the grievance; (2) a grievant is precluded from raising before the System Board an issue not raised in the original grievance; and (3) Jackson Martin raised Paragraph 6(B) of the Cost Reduction Memorandum in his original grievance filed on September 9, 1994.